# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Novartis and Par Antitrust Litigation* | 1:18-cv-04361-AKH |
| **This Document Relates To:** | **FILED UNDER SEAL** |
| **All Actions** | |

**PLAINTIFFS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT ON THE STATUTE OF LIMITATIONS**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   FACTS ....................................................................................................................2

III.  ARGUMENT .........................................................................................................6

      A.    Under the Continuing Violation Doctrine, Plaintiffs Are Entitled to Recover Overcharges on All Purchases Made in the Four Years Preceding Direct Purchasers' Complaint................................................................................6

      B.    Defendants' Fraudulent Concealment Tolls the Statute of Limitations as to Purchases Prior to May 16, 2014...............................................................14

            1.    Defendants Bear an "Extraordinary" Burden to Defeat Fraudulent Concealment on Summary Judgment........................................................14

            2.    There Is a Material Dispute About Whether Defendants Concealed the No-AG Clause ................................................................17

            3.    Plaintiffs Had No Reason to Suspect that Novartis Had Agreed to a No-AG Clause Until March 31, 2015, When Novartis Began Selling AG Exforge 181 Days After Par's Generic Launch.....................22

                  a)    There Was No Publicly Available Information That Would Have Put Plaintiffs on Notice of Their Claims.................23

                  b)    Defendants' Pre-Limitations Period Disclosures to Some Plaintiffs Did Not Put Them on Notice of Defendants' No-AG Agreement ......................................................................26

                  c)    There Is a Material Dispute About Plaintiffs' Diligence...............28

      C.    State Limitations Statutes Do Not Bar EPPs' Claims ...........................................29

            1.    EPPs Can Demonstrate Fraudulent Concealment ......................................29

            2.    EPPs Can Demonstrate Continuing Violations .........................................33

IV.   CONCLUSION ....................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Dairy Farmers of Am., Inc.*,
  2014 WL 2610613 (D. Vt. June 11, 2014) .......................................................................14, 32

*Am. Pipe & Constr. Co. v. Utah*,
  414 U.S. 538 (1974) ......................................................................................................................3

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001)....................................................................................................21

*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*,
  843 F.3d 1225 (10th Cir. 2016) ..................................................................................................13

*Baskin v. Hawley*,
  807 F.2d 1120 (2d Cir. 1986) .................................................................................................2, 20

*Bennett Silvershein Assocs. v. Furman*,
  1997 WL 531310 (S.D.N.Y. Aug. 28, 1997) ..............................................................................20

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ..............................................................................................passim

*Butala v. Agashiwala*,
  1997 WL 79845 (S.D.N.Y. Feb. 24, 1997) ................................................................................20

*City of Pontiac Gen. Emples. Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011) .......................................................................................................24

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
  523 F.2d 389 (6th Cir. 1975) ......................................................................................................28

*Dietrich v. Bauer*,
  76 F. Supp. 2d 312 (S.D.N.Y. 1999) ..........................................................................................15

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
  2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ...............................................................17, 27, 28

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013) .......................................................................................................21, 23, 24

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
  991 F.3d 370 (2d Cir. 2021) .......................................................................................................17

*Grynberg v. Eni S.p.A.*,
   2009 WL 2482181 (S.D.N.Y. Aug. 13, 2009) ...................................................15, 16

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) ...........................................................................................7, 13

*Harding v. Naseman*,
   2008 WL 4900562 (S.D.N.Y. Nov. 14, 2008) ...........................................................15

*Humana Inc. v. Celgene Corp.*,
   2022 WL 1237883 (D.N.J. Apr. 27, 2022) .............................................................6, 11

*Impax Lab'ys., Inc. v. FTC*,
   994 F.3d 484 (5th Cir. 2021) .....................................................................................28

*In re Air Cargo Shipping Services Antitrust Litig.*,
   2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ............................................21, 28, 32

*In re Aggrenox Antitrust Litig.*,
   94 F. Supp. 3d 224 (D. Conn. 2015) ...............................................................6, 9, 19

*In re Aggrenox Antitrust Litig.*,
   2015 WL 4459607 (D. Conn. July 21, 2015) ..............................................................8

*In re Beef Indus. Antitrust Litig.*,
   600 F.2d 1148 (5th Cir. 1979) ......................................................................14, 16, 32

*In re Buspirone Patent Litig.*,
   185 F. Supp. 2d 363 (S.D.N.Y. 2002) .........................................................................6

*In re Cardizem CD Antitrust Litig.*,
   332 F.3d 896 (6th Cir. 2003) .....................................................................................21

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
   261 F. Supp. 2d 188 (E.D.N.Y. 2003) ...........................................................18, 19, 27

*In re DDAVP Direct Purchaser Antitrust Litig.)*,
   585 F.3d 677 (2d Cir. 2009) ......................................................................................15

*In re Effexor Antitrust Litig.*,
   357 F. Supp. 3d 363 (D.N.J. 2018) ..............................................................................7

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
   336 F. Supp. 3d 1256 (D. Kan. 2018) .....................................................................7, 9

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
   545 F. Supp. 3d 922 (D. Kan. 2021) ...................................................................19, 20

*In re Glumetza Antitrust Litig.*,
    2020 WL 1066934 (N.D. Cal. Mar. 5, 2020) ............................................................ passim

*In re Glumetza Antitrust Litig.*,
    2021 WL 1817092 (N.D. Cal. May 6, 2021) ........................................................................ 19

*In re K-Dur Antitrust Litig.*,
    686 F.3d 197 (3d Cir. 2012) ............................................................................................... 21

*In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*,
    172 F. Supp. 3d 724 (D.N.J. 2016) ............................................................................... 19, 25

*In re Niaspan Antitrust Litig.*,
    42 F. Supp. 3d 735 (E.D. Pa. 2014) .......................................................................... 7, 18, 23

*In re Niaspan Antitrust Litig.*,
    2015 WL 8150588 (E.D. Pa. Dec. 8, 2015) ......................................................................... 7

*In re Nine W. Shoes Antitrust Litig.*,
    80 F. Supp. 2d 181 (S.D.N.Y. 2000) ................................................................................. 17

*In re Picard*,
    917 F.3d 85 (2d Cir. 2019) ............................................................................................... 1, 9

*In re Polyurethane Foam Antitrust Litig.*,
    152 F. Supp. 3d 968 (N.D. Ohio 2015) ............................................................................. 31

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    860 F.3d 1059 (8th Cir. 2017) ........................................................................................ 6, 13

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ................................................................................. 15, 16

*In re Rezulin Prods. Liab. Litig.*,
    392 F. Supp. 2d 597 (S.D.N.Y. 2005) ............................................................................ 30, 31

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
    2013 WL 2181185 (E.D. Tenn. May 20, 2013) ................................................................ 7, 19

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
    2015 WL 5458570 (D. Mass. Sept. 16, 2015) ...................................................................... 7

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    752 F.3d 728 (8th Cir. 2014) ............................................................................................... 8

*Johnson v. Priceline.com, Inc.*,
    711 F.3d 271 (2d. Cir. 2013) ............................................................................................. 31

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*,
   791 F.3d 388 (3d Cir. 2015) ...................................................................23

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) ...................................................................7, 12

*Litovich v. Bank of America*,
   2021 WL 4952034 (S.D.N.Y. Oct. 25, 2021) ...................................................................12

*McKinnon v. Honeywell Int'l, Inc.*,
   977 A.2d 420 (Me. 2009) ...................................................................34

*Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc.*,
   392 F.3d 265 (8th Cir. 2004) ...................................................................12

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
   198 F.3d 823 (11th Cir. 1999) ...................................................................14, 15, 16, 32

*N.Y. ex rel. Spitzer v. Feldman*,
   2003 WL 21576518 (S.D.N.Y. July 10, 2003) ...................................................................15

*Nev. Recycling & Salvage, Ltd. v. Reno Disposal Co.*,
   423 P.3d 605 (Nev. 2018) ...................................................................34

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014) ...................................................................13

*Pickern v. Holiday Quality Foods*,
   293 F.3d 1133 (9th Cir. 2002) ...................................................................13

*Polaris Innovations, Ltd. v. Kingston Tech. Co., Inc.*,
   2017 WL 2806897 (C.D. Cal. Mar. 30, 2017) ...................................................................13

*Precision Assocs.Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ...................................................................9, 28, 29

*Rite Aid Corp. v. Am. Express Travel Related Servs. Co.*
   708 F. Supp. 2d 257 (E.D.N.Y. 2010) ...................................................................10

*Robertson v. Seidman & Seidman*,
   609 F.2d 583 (2d Cir. 1979) ...................................................................15

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
   2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016) ...................................................................6, 8

*Shak v. JPMorgan Chase & Co.*,
   156 F. Supp. 3d 462 (S.D.N.Y. 2016) ...................................................................3

*Simmonds v. Lynch*,
  649 F. App' x 44 (2d Cir. 2016) ................................................................................. 9

*Somaxon Pharms., Inc. v. Actavis Elizabeth LLC*,
  2020 WL 1903171 (D. Del. Apr. 9, 2020) ............................................................... 2

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017) ............................................................... 2, 18

*State v. Wyeth*,
  373 P.3d 964 (Nev. 2011) ...................................................................................... 34

*State of N.Y. v. Hendrickson Bros.*,
  840 F.2d 1065 (2d Cir. 1988) ................................................................................ 14

*Stokes v. Girdich*,
  2009 WL 579139 (2d Cir. Mar. 5, 2009) ............................................................... 9

*Stone v. Williams*,
  970 F.2d 1043 (2d Cir. 1992) ............................................................... 29, 31, 32

*Thompson v. Metro. Life Ins. Co.*,
  149 F. Supp. 2d 38 (S.D.N.Y. 2001) ............................................................. 14, 16

*Union of Needletrades, Indus. and Textile Emps. v. U.S. INS*,
  336 F.3d 200 (2d Cir. 2003) .................................................................................... 9

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) .................................................................. 1, 10, 11

*US Airways v. Sabre Holdings Corp.*,
  2022 WL 874945 (S.D.N.Y. Mar. 24, 2022) .............................................. 1, 11

*Veltri v. Bldg. Serv. 32B-J Pension Fund*,
  393 F.3d 318 (2d Cir. 2004) .................................................................................... 9

*Wild Horse Observers Association, Inc. v. Jewell*,
  550 F. App'x 638 (10th Cir. 2013) ....................................................................... 13

*Wolf v. Wagner Spray Tech Corp.*,
  715 F. Supp. 504 (S.D.N.Y. 1989) ....................................................................... 27

*Z Technologies Corp. v. Lubrizol Corp.*,
  753 F.3d 594 (6th Cir. 2014) ......................................................................... 12, 13

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  401 U.S. 321 (1971) ................................................................................................ 7

**<u>Statutes</u>**

15 U.S.C. § 15b ...................................................................................................................3

**<u>Rules</u>**

Fed. R. Civ. P. 11(a)(3) ......................................................................................................26

## I.    <u>INTRODUCTION</u>

It is undisputed that all Plaintiffs and absent class members purchased brand and/or generic Exforge within 4 years of the date of the first-filed class complaints.[1] Accordingly, under the continuing violation doctrine, Plaintiffs' claims are timely. Summary judgment on the statute of limitations should be denied on this ground alone.

Defendants argue that the Second Circuit's 2019 decision in *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019) ("*Sabre I*"), abrogated the continuing violation doctrine as to purchasers, overturning binding Supreme Court authority and *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979). This is obviously incorrect. The Second Circuit cannot overturn binding Supreme Court decisions, and the notion of one panel silently overturning the holding of a prior panel "is a nonstarter." *In re Picard*, 917 F.3d 85, 102 n.13 (2d Cir. 2019). Every single court to have considered Defendants' argument has rejected it out of hand, including Judge Schofield on remand in *US Airways v. Sabre Holdings Corp.*, 2022 WL 874945 (S.D.N.Y. Mar. 24, 2022) ("*Sabre II*"). Novartis's counsel in this case was also counsel for defendant in *Sabre I* and expressly recognized in briefing that the continuing violation doctrine applies to claims of purchasers for their purchases from conspirators, but not to parties challenging the terms of their own contract – the key distinction between *Sabre I* and *Berkey Photo*.

Defendants also seek partial summary judgment on whether the fraudulent concealment doctrine permits Plaintiffs to recover damages *more* than four years before the filing of the class complaints. Defendants are not entitled to summary judgment on this basis either. Fraudulent concealment can best be dealt with during a damages phase of trial or on apportionment.

---

[1] All but one member of the Direct Purchaser Class made direct purchases within the 4-year period before the filing of this case. *See* Direct Purchaser Class Pls.' Reply in Supp. of Mot. for Class Cert. (ECF No. 510), at 2 & n.1.

Paradoxically, Defendants argue that fraudulent concealment does not toll any claims because Plaintiffs were on notice of a "No-AG" reverse payment agreement[2] that **Defendants continue to vehemently deny ever existed**. Faced with similar arguments, Judge Stein criticized defendants for their "breathtaking inconsistency." *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 568 (S.D.N.Y. 2017).

Notwithstanding this fundamental inconsistency, whether fraudulent concealment is available is factual in nature and generally not susceptible to summary judgment. Defendants claim that Par disclosed at various times between 2012 and 2014 that Novartis licensed Par to launch generic Exforge in October 2014. But Defendants do not dispute that these disclosures omitted the singular fact that makes their conduct anticompetitive and thus actionable: the existence of a No-AG reverse payment. Because brand drug companies do not always launch AGs, there was no reason for any Plaintiff to suspect such an agreement until Novartis belatedly launched its AG on the exact end of Par's 180-day regulatory exclusivity period.[3] Defendants' limited disclosures were nothing more than "half truths, and omissions," *i.e.*, the exact type of deceptive conduct that *supports* a finding of fraudulent concealment. *Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir. 1986).

## II.  FACTS

Plaintiffs challenge the No-AG clause of the license agreement between Novartis and Par dated December 2, 2011 (the "Novartis-Par License Agreement" or "NPLA"). The NPLA required

---

[2] Pursuant to a "No-AG" clause a generic manufacturer agrees to delay its competition in exchange for a promise from the brand not to launch an authorized generic, or "AG" for a period of time following the generic's delayed launch.

[3] A brand can launch an authorized generic even during the first generic's 180-day period of regulatory exclusivity, but other generics cannot launch their products during this period. *See Somaxon Pharms., Inc. v. Actavis Elizabeth LLC*, 2020 WL 1903171, at *1 n.2 (D. Del. Apr. 9, 2020).

Par to delay its entry of generic Exforge until September 30, 2014, and in exchange, Novartis

agreed to not launch AG Exforge for 180-days following Par's launch, *i.e.*, until March 31, 2015.

RSoF ¶¶ 2, 64.[4] Ultimately, that is exactly what happened. Novartis launched its Exforge AG on

March 31, 2015, after 180 days following Par's generic launch. *Id.*

The statute of limitations on federal antitrust claims is four years.[5] 15 U.S.C. § 15b. On

May 16, 2018, just over three years after Novartis's delayed AG launch, named Direct Purchaser

Class Plaintiff Drogueria Betances, LLC filed an antitrust complaint against Defendants on its own

behalf and on behalf of a class of direct purchasers of brand and generic Exforge, alleging that

they were overcharged on such purchases within the prior four years. ECF No. 1, ¶ 125. Retailer

Plaintiffs[6] brought suit on their own behalf and on assignments from their respective wholesalers

of claims with respect to the wholesalers' purchases of brand and/or generic Exforge resold to the

Retailer Plaintiffs. RSoF ¶ 6. Pursuant to the doctrine of class action tolling, the timeliness of

Retailer Plaintiffs' claims is determined based upon the filing date of the first direct purchaser

class action complaint on May 16, 2018.[7] On June 19, 2018, UFCW Local 1500 Welfare Fund

("UFCW") filed a class action complaint against Defendants on behalf of itself and a class of end

payors of brand and generic Exforge. ECF No. 1, Case No. 1:18-cv-05536 (S.D.N.Y). Plaintiffs

also alleged that Defendants fraudulently concealed that the NPLA required Novartis to refrain

---

[4] "RSoF" refers to Plaintiffs' Joint Response to Defendants' Statement of Undisputed Material Facts, filed contemporaneously herewith.

[5] For the End-Payor Plaintiffs' state law antitrust claims, 19 states have statute of limitations of four years and three states have statutes of limitations of six years. *See* 29 n.29, *infra*.

[6] Retailer Plaintiffs are CVS Pharmacy, Inc.; Rite Aid Corporation; Rite Aid Hdqtrs. Corp.; Walgreen Co.; The Kroger Co.; and H-E-B, L.P.

[7] *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974) (filing of class action tolls the statute of limitations as to all absent class members); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 475 (S.D.N.Y. 2016) ("Under *American Pipe*, 'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.'") (quoting *Am. Pipe*, 414 U.S. at 554).

from launching AG Exforge following Par's launch. *E.g.*, ECF Nos. 47, 112, 138-49.

Defendants point to three public disclosures that they claim purportedly put Plaintiffs on notice of their claims:

- A statement in Par's 10-K for the fiscal year ending December 31, 2011 that "we have a certain launch date in October 2014." Defs.' Br. 10.

- A statement to a financial analyst that Par "ensure[d] a date certain launch . . . commencing in October of 2014." *Id*.

- A statement in Novartis's January 25, 2012 20-F that "under a license agreement with a generics manufacturer, [Exforge] is expected to face generic competition in the US beginning in October 2014." *Id*.

***None*** of the above disclosures reveal the anticompetitive conduct that Plaintiffs challenge – Novartis's *agreement* not to launch an AG until 180 days after Par's generic launch. RSoF ¶¶ 109-10, 112.

Defendants also claim they made private disclosures to a small number of absent class members and Retailer Plaintiffs at trade shows. But when asked about these purported disclosures, Par's former CEO Paul Campanelli confirmed that Par disclosed only its belief that Novartis would not launch an AG, but not the unlawful No-AG clause:

Q: Is [the September 2014 entry date] the only aspect of [the NPLA] that you disclosed?

A: It would have been our – our position [at trade shows] that we did not believe Novartis was going to and license a – an authorized generic. We did not believe Sandoz [Novartis's AG distributor] was going to come to the market.

RSoF ¶ 122 (citing Campanelli Tr. 318:10-20). Mr. Campanelli confirmed that Par only "disclosed the entry date of September 2014," and not "every single subsection" of § 1.2 of the NPLA, the section containing the No-AG clause. *Id.* ¶¶ 58, 110-12 (citing Campanelli Tr. 318:1-9).

Indeed, Defendants continue to deny that the NPLA contains a No-AG clause. Plaintiffs strongly disagree with Defendants' view of the evidence. But, if Defendants continue to deny the

existence of the No-AG clause today, what could they have disclosed in the past that would have provided actual or inquiry notice to Plaintiffs of their claims? Indeed, none of Defendants' purported disclosures came close to revealing the No-AG clause.

For example, in February 2014, Par purportedly told McKesson (a member of the Direct Purchaser Class) that Par's launch "would be exclusive . . . with no-AG." Defs.' Br. 12. Defendants claim that Par made similar disclosures to CVS,[8] HEB[9] and Walgreens.[10] Defs.' Br. 13-14. Even if these entities had knowledge that Par believed that it would not face an AG when it launched, they did not know *why* there would not be an AG. Specifically, they did not know that Novartis's agreement not to introduce an AG was a reverse payment to induce Par to delay generic entry. *E.g.*, RSoF ¶¶ 109, 129, 132. Class members who testified were ███████ that ██████████ ███████████████████████████████████████████████████████████████████ *Id.* ¶ 144; *id.* ¶ 145 (when asked whether AmerisourceBergen's corporate representative "had ever discussed pipeline with the manufacturers at [trade shows]," he responded, ████████████); *id.* ¶ 146 (█████████████████████████████████████████████████████████████████

---

[8] Defendants reference an email in which a CVS employee noted that ██████████████████ As the court recognized in *In re Glumetza Antitrust Litigation*, similar language could just as easily refer to Par's 180-day period of regulatory exclusivity during which time the FDA would be prohibited from approving the application of another *generic* drugmaker. 2020 WL 1066934, at *7 (N.D. Cal. Mar. 5, 2020) ("Defendants contend 'sole exclusivity' obviously meant that Lupin's 180 days of exclusivity would not be compromised by an AG launch. But, recall, two 180-day exclusivity periods hover over Lupin's market entry: (1) FDA-granted 180 days of exclusivity against other generics; and (2) the settlement-granted 180 days without an authorized generic. So facially, the subject of 'sole exclusivity' is open to reasonable dispute.") (citation omitted); *see also* RSoF ¶¶ 156-57.

[9] HEB purportedly received information from Novartis's subsidiary Sandoz. Defs.' Br. 14. But there is no evidence that Sandoz disclosed that the reason there would not be an AG was because of a reverse payment. *See* RSoF ¶¶ 162-64.

[10] Defendants reference a document that Sandoz purportedly gave to Walgreens at a trade show. Defs.' Br. 14. But there is no evidence that the document or the information in it was ever given to Walgreens or that Walgreens ever met with Sandoz at the trade show, let alone evidence that Sandoz disclosed that the reason there would not be an AG was because of a reverse payment. *See* RSoF ¶¶ 168, 170.



); *id.* ¶ 151 (class member Cardinal testified ███████████████

██████████████████████████████████████; *id.* ¶ 208 (a document shown

to Rite Aid stated that ████████████████████████████████████.

Defendants point to no evidence that any Defendant disclosed to any Plaintiff or absent class

member that the NPLA contained a No-AG clause.

At bottom, Defendants point to no evidence that they disclosed the No-AG provision.

Accordingly, there is no basis to find that Plaintiffs were on notice of their claims.

## III.   ARGUMENT

### A.   Under the Continuing Violation Doctrine, Plaintiffs Are Entitled to Recover Overcharges on All Purchases Made in the Four Years Preceding Direct Purchasers' Complaint

Plaintiffs and class members purchased brand and/or generic Exforge during the four years

preceding the earliest class complaint. Accordingly, even setting aside their fraudulent

concealment allegations, they are entitled to recover any overcharges incurred during that time

under the continuing violation doctrine, as every court to have examined the issue has concluded.[11]

---

[11] *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064 n.2, 1065-66 (8th Cir. 2017) (*en banc*) (reversing dismissal of complaint and explaining that "[e]very other circuit to consider this issue applies *Klehr*, holding that each sale in a price-fixing conspiracy is an overt act that restarts the statute of limitation.") (collecting cases); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, 2016 WL 4992690, at *16 (S.D.N.Y. Sept. 13, 2016) ("Direct Purchaser Plaintiff may assert claims for damages it incurred up to four years prior to the filing of its complaints[.]"); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002) ("if a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings.") (citing *Berkey Photo*, 603 F.2d at 294-96); *id.* at 379-80 ("plaintiffs' claims survive . . . to the extent that the claims are based on allegations of injury arising from purchases of Buspar at allegedly inflated prices beginning four years prior to the filing" of the complaints); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 237-39 (D. Conn. 2015) (rejecting argument that purchasers' claims accrued "when the . . . [alleged reverse payment] settlement was reached and publicly announced . . . outside of the four-year window"); *Humana Inc. v. Celgene Corp.*, 2022 WL 1237883, at *5-11 (D.N.J. Apr. 27, 2022) (plaintiff could recover for damages incurred in the four-year period prior to the filing of the complaint under the continuing violation doctrine despite defendants' argument that the challenged conduct occurred much earlier because plaintiff's allegations were "akin to [those in] pay-for-delay [cases]," "which courts overwhelmingly have found *(continued on next page)*

Specifically, under the continuing violation doctrine, a purchaser's overcharge claim accrues and runs from the date of each supracompetitive overcharge, regardless of whether a defendant's unlawful conspiracy may have begun more than four years earlier. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968)[12]; *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)[13]; *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997).[14]

The Second Circuit has faithfully applied this binding precedent, holding that purchaser claims "cannot accrue until [the purchaser] actually pays the overcharge," because the purchaser "is not harmed until the monopolist actually exercises its illicit power to extract an excessive price." *Berkey Photo*, 603 F.2d at 295. As the court in *In re Aggrenox Antitrust Litigation* explained:

> The defendants argue that the rule of *Berkey Photo*, as I have interpreted it (and as the Second Circuit expressly stated it), would "endlessly" or "indefinitely" extend

support application of the continuing violations doctrine to each supracompetitive sale."); *Glumetza*, 2020 WL 1066934, at *6 ("most other cases to address this question have concluded that continued overcharges constitute a continuing violation" in reverse payment cases); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, at 1328 (D. Kan. 2018) (plaintiffs can recover overcharges incurred within the four-year period prior to the filing of the complaint) (collecting cases); *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 384-85 (D.N.J. 2018) (similar); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 WL 5458570, at *7-9 (D. Mass. Sept. 16, 2015) (similar); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 746-47 (E.D. Pa. 2014) ("Every court to have considered this issue in the pay-for-delay context has held that a new cause of action accrues to purchasers upon each overpriced sale of the drug.") (collecting cases), *reconsideration denied* 2015 WL 8150588 (E.D. Pa. Dec. 8, 2015); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2013 WL 2181185, at *27-79 (E.D. Tenn. May 20, 2013) (rejecting argument that price-fixing cases like *Klehr* are "not directly analogous to the anticompetitive scheme or conspiracy" in reverse payment case).

[12] "Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955," because of "continuing and accumulating harm." *Id.*

[13] "[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.* The Court explained that the plaintiff's claim accrues when it "feels the adverse impact of an antitrust conspiracy." *Id.*

[14] "Antitrust law provides that, in the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Id.*, 521 U.S. at 189 (internal quotation marks omitted).

the statute of limitations, depriving a monopolist of the repose the statute of limitations should offer . . . [T]he rule of *Berkey Photo* extends the statute of limitations no more endlessly than the monopolist extends the excessive price. When the price stops being excessive—or when the monopolist stops enjoying the "flower of evil," as the *Berkey Photo* Court put it—the statute-of-limitations clock starts ticking. So long as the anticompetitive pricing remains, there can be no guarantee of repose from purchaser actions. *Berkey Photo* is quite clear on that point[.]

2015 WL 4459607, at *6 (D. Conn. July 21, 2015).

Ignoring *Berkey Photo*'s express language that claims "accrue" when a purchaser "actually pays the overcharge," Defendants argue that Plaintiffs' claims accrued when "the allegedly anticompetitive conduct occurred in December 2011 with Defendants' execution of the License Agreement." Defs.' Br. 20. But the "allegedly anticompetitive conduct" is not, as Defendants would have it, the act of inking a paper, which harms no one. Rather, the "allegedly anticompetitive conduct" is overcharging Plaintiffs. If Defendants were correct that claims do not continue to accrue after a contract is executed, then "two parties could agree to divide markets for the purpose of raising prices, wait four years to raise prices, then reap the profits of their illegal agreement with impunity because any antitrust claims would be time barred." *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 736 (8th Cir. 2014). This is not the law. As then-Chief Judge McMahon explained, "[t]he wrong complained of is not the execution of the [reverse payment] settlement agreements . . . those acts laid the foundation for the pocketbook injury Plaintiffs ultimately suffered; but the actual injury was worked by the overcharge itself" so plaintiff "may assert claims for damages it incurred up to four years prior to the filing of its complaints." *Sergeants Benevolent Ass'n Health & Welfare Fund*, 2016 WL 4992690, at *16 (citing *Berkey Photo*, 603 F.2d at 294-96).[15]

---

[15] *See Glumetza*, 2020 WL 1066934, at *6 ("it is true that the sulphorous agreement occurred in 2012, but the *conduct taken* to cause competitive harm continued well into the later four-year period . . . each *(continued on next page)*

Defendants argue that the Second Circuit's decision in *Sabre I* held that purchasers cannot bring overcharge claims four years after the formation of a conspiracy and implicitly overturned *Berkey Photo*. Defs.' Br. 21-22. But *Sabre* could not overrule the binding Supreme Court precedent of *Hanover Shoe*, *Zenith*, and *Klehr*. And, an argument that *Sabre I* "silently 'superseded'" *Berkey Photo* "is a nonstarter." *In re Picard*, 917 F.3d at 102 n.13 (citing *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 327 (2d Cir. 2004) ("One panel of this Court cannot overrule a prior decision of another panel, unless there has been an intervening Supreme Court decision that casts doubt on our controlling precedent.")); *Simmonds v. Lynch*, 649 F. App' x 44, 46 (2d Cir. 2016) (same); *Stokes v. Girdich*, 2009 WL 579139, at *1 (2d Cir. Mar. 5, 2009) (same); *Union of Needletrades, Indus. and Textile Emps. v. U.S. INS*, 336 F.3d 200, 210 (2d Cir. 2003) (same).

Defendants claim that they are not arguing that *Sabre I* silently overturned *Berkey Photo* because "*Berkey Photo* involved allegations of continuing affirmative acts within the limitations period" while *Sabre I* dealt with conduct outside the limitations period. Defs.' Br. 22. Defendants manufacture this distinction from whole cloth. *Berkey Photo* leaves little room for interpretation about its express holding: "*We hold*, therefore, that a purchaser suing a monopolist for overcharges paid *within the previous four years* may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken *before the limitations period*." 603 F.2d at 296 (emphases added). *See also Precision Assocs.*, 2011 WL 7053807, at *47 ("In *Berkey Photo, Inc. v. Eastman Kodak*

---

continuing violation (*i.e.*, each new sale)" started "the statute of limitations anew for *that act*" because "continued overcharges constitute a continuing violation") (emphases in original); *EpiPen*, 336 F. Supp. 3d at 1329 ("the 'pay-for-delay' settlements were not the 'final' act of the conspiracy. Rather, defendants engaged in new and additional acts each time they charged the allegedly inflated prices . . . And each of those acts inflicted a new and accumulating injury on the class plaintiffs because they had paid inflated prices[.]") (citation omitted); *Aggrenox*, 94 F. Supp. 3d at 237-39; *Precision Assocs.Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *48 (E.D.N.Y. Jan. 4, 2011) ("The statute of limitations for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the violation's inception.") (internal quotation marks omitted).

*Co.*, the plaintiff charged that the defendant achieved a monopoly through anti-competitive conduct prior to the limitations period, as a result of which the plaintiff purchasers continued to pay overcharges into the limitations period.").

*Sabre I* holds only that parties to a contract cannot seek damages more than four years after they entered into the contract.[16] Defendants contend that "the Second Circuit said no such thing." Defs.' Br. 21. Defendants are wrong. In *Sabre I*, the Second Circuit expressly and repeatedly referred to Sabre's conduct performed pursuant to "agreements binding *the parties*." *Sabre I*, 938 F.3d at 68 (emphasis added); *id.* at 67 (case involved "US Airways's claims for damages arising out of its [own] 2006 contract with Sabre"). Thus, the Court held that payments made under a contract between contracting parties are not overt acts for which a new claim for damages accrues. *Id.* at 68-69. The Court thus adopted the position of Novartis's current counsel, who argued in the *Sabre I* appellate briefing that "[p]ayments of fees *specified in a prior contract* do not trigger the continuing violation exception because *[c]ollecting a contract fee* is not a new and independent act."[17] Accordingly, *Berkey Photo* applies to this case because like the plaintiff in *Berkey Photo*,

---

[16] *Sabre I* resolved a "split among district courts in the Circuit" involving the applicability of the continuing violation to claims that did *not* involve purchasers. *Sabre I* rejected *Rite Aid Corp. v. Am. Express Travel Related Servs. Co.*'s application of the continuing violation doctrine to "plaintiff's challenge to its own contract." 708 F. Supp. 2d 257, 269 (E.D.N.Y. 2010).

[17] Reply and Resp. Br. of Defs-Appellants-Cross-Appellees Sabre Holdings Corp., Sabre Travel Int'l Ltd. and Sabre Glbl Inc. (Final Form) at 57-58, *US Airways v. Sabre Holdings Corp.*, No. 17-960 (2d Cir. Feb. 20, 2018), ECF No. 147 (emphases added) (citations omitted). Other counsel for Sabre similarly distinguished *Berkey Photo* in the district court. *See* Sabre's Reply Mem. of Law in Supp. of its Mot. for Summ. J., *U.S. Airways v. Sabre Holdings Corp.*, No. 1:11-cv-02725-LGS (S.D.N.Y. Mar. 12, 2015), ECF No. 266 at 22 ("In-circuit cases precedent confirms that *Berkey Photo* does not apply in a case such as this where a plaintiff alleges that its own pre-limitations period contract restrains trade in violation of Section 1."); *id.* at 23 (US Airways' cited cases did not "involve[] a plaintiff challenging *its own contracts* as anticompetitive.") (emphasis added); Oct. 14, 2014 Tr. 15:3-5, *U.S. Airways v. Sabre Holdings Corp.*, No. 1:11-cv-02725-LGS (S.D.N.Y. Oct. 24, 2014) (previously filed in this case at ECF No. 513-1) ("claims based on *anticompetitive agreements to which the plaintiff is a party* accrues at the time of that agreement's execution.") (emphasis added); *id.* at 16:12-25 ("but *Berkey* is a case that was very different from our case . . . [W]hat U.S. Air[ways] did was to read *Berkey* to apply to a Section 1 claim *where the plaintiff was a party to the contract*[.]") (emphasis added).

Plaintiffs in this case are purchasers. By contrast, *Sabre I* would apply if Par were somehow to assert antitrust claims against Novartis based on the NPLA.

Multiple courts have recognized that *Berkey Photo* is reconcilable with *Sabre I* for the simple reason that *Berkey Photo* dealt not with contracting parties but with purchasers, and have predictably and correctly rejected Defendants' argument that *Sabre I* applies to purchasers. *First*, on remand, Judge Schofield explained that *Sabre I* held that "a defendant does not commit an overt act restarting the statute of limitations each time a plaintiff pays a defendant a supracompetitive price *pursuant to an anticompetitive contract to which they are a party*." *Sabre II*, 2022 WL 874945, at *6 (emphasis added). *Sabre II* explained that in *Berkey Photo*, "[t]he court distinguished between plaintiffs who are competitors and plaintiffs who are purchasers," that "[n]either *Hanover Shoe* nor *Berkey Photo* involved an anticompetitive contract as the instant case does," and that "the Second Circuit's basis [in *Sabre I*] for distinguishing *Hanover Shoe* was not that it involved an ongoing monopoly, but rather that [the *Hanover Shoe* plaintiff's] claims did not arise out of a contract to which Plaintiff and Defendant were parties." *Id*. Similarly, in *Humana Inc. v. Celgene Corp.*, the court explained that:

> In *US Airways*, 938 F.3d 43, the Second Circuit held that a defendant does not commit an overt act each time a plaintiff pays a supracompetitive price pursuant to a contract because "[a] contract is a vehicle for determining at the time of contracting what should happen at some time thereafter." *Id.* at 69. However, the Court here is not dealing with an earlier contract for sale entered into between Humana and Celgene, and *US Airways* did not purport to overrule or abrogate *Berkey Photo*.

2022 WL 1237883, at *11. Thus, in analyzing the timeliness of purchasers' claims, the court determined that the "facts are akin to pay-for-delay, which courts overwhelmingly have found support application of the continuing violations doctrine to each supracompetitive sale." *Id*. at *9.

None of the Defendants' cases warrant a departure from *Berkey Photo*. *Litovich v. Bank of America*, supports Plaintiffs not Defendants. In that case, Judge Liman distinguished the anticompetitive effects of a group boycott where "higher prices are not the conspiracy itself but are, at most, the effects of the boycott agreement and actions," from price fixing cases, where "higher prices are . . . the conspiracy itself." 2021 WL 4952034, at *27 (S.D.N.Y. Oct. 25, 2021), *appeal filed*, No. 21-2905 (2d Cir. Nov. 23, 2021). The purpose of the boycott in *Litovich* was to punish non-conspirators, while the purpose of price fixing is to extract higher prices from purchasers. The purpose of the No-AG clause in the NPLA was to keep the prices of brand and generic Exforge high, *i.e.*, "higher prices are . . . the conspiracy itself." *Id.*, at *27. This case is unlike *Litovich*.

Nor do *Z Technologies Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014), and *Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004), support Defendants. Defendants say that those cases stand for the proposition that the continuing violation doctrine does not toll the statute of limitations for antitrust claims "if the plaintiff had actual knowledge of the initial violation and suffered an injury." Defs.' Br. 22. Setting aside the genuine dispute of fact as to whether Plaintiffs' had "actual knowledge" of the No-AG agreement, those cases cannot overrule the Supreme Court's decision in *Klehr*, which stated that "[a]ntitrust law provides that . . . each sale to the plaintiff, starts the statutory period running again, *regardless of the plaintiff's knowledge of the alleged illegality at much earlier times*." 521 U.S. at 189 (emphasis

12

added) (quotation marks and citation omitted).[18, 19]

Indeed, *Z Technologies* and *Midwestern Machinery* are consistent with *Klehr* and the other cases Plaintiffs cite because they are merger cases, not conspiracy or monopolization cases like this one. In *Z Technologies*, the Sixth Circuit declined to apply the continuing violation doctrine because it and the Supreme Court "employ[] the [continuing violations] doctrine only in conspiracy and monopolization cases not involving mergers." 753 F.3d at 599. Similarly, in *Midwestern Machinery*, the Eighth Circuit explained that "[u]nlike a conspiracy or the maintaining of a monopoly, a merger is a discrete act, not an ongoing scheme. A continuing violation theory based on overt acts that further the objectives of an antitrust conspiracy in violation of § 1 of the Sherman Act or that are designed to promote a monopoly in violation of § 2 of that act cannot apply to mergers under § 7." As the Eighth Circuit subsequently explained, *Midwestern Machinery* "expressly disavow[ed] any modification to the *Klehr* continuing violation doctrine." *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d at 1067-68.

Finally, *Wild Horse Observers Association, Inc. v. Jewell*, 550 F. App'x 638 (10th Cir. 2013), and *Pickern v. Holiday Quality Foods*, 293 F.3d 1133 (9th Cir. 2002), are not even antitrust cases. Courts in the Tenth and Ninth Circuits follow *Klehr* in antitrust cases. *See Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1247-48 (10th Cir. 2016); *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086-87 (9th Cir. 2014); *Polaris Innovations, Ltd. v. Kingston Tech. Co., Inc.*, 2017 WL 2806897, at *12 (C.D. Cal. Mar. 30, 2017).

---

[18] Defendants may argue that this language from *Klehr* was dicta but "federal courts 'are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . [the dicta] is of recent vintage and not enfeebled by any [later] statement.'" *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064 (8th Cir. 2017) (*en banc*) (citation omitted).

[19] Plaintiff in *Hanover Shoe* also undoubtedly knew for decades that it was being required to lease shoe machinery rather than buying it as it preferred to do. 392 U.S. 481.

13

## B. Defendants' Fraudulent Concealment Tolls the Statute of Limitations as to Purchases Prior to May 16, 2014

### 1. Defendants Bear an "Extraordinary" Burden to Defeat Fraudulent Concealment on Summary Judgment

An "antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

At trial, Plaintiffs will ultimately have the burden of proving the elements of fraudulent concealment, but that does not require them to establish them beyond dispute at summary judgment as Defendants argue. Defs.' Br. 5. As Judge Baer explained, "although the plaintiffs ultimately bear the burden of proving that their claims fall within this 'exception' to the statute of limitations, at this stage of the litigation, the burden, as in any summary judgment motion, falls squarely on the defendant to show that there is no material issue of fact." *Thompson v. Metro. Life. Ins. Co.*, 149 F. Supp. 2d 38, 49-50 (S.D.N.Y. 2001). *See also Allen v. Dairy Farmers of Am., Inc.*, 2014 WL 2610613, at *23 (D. Vt. June 11, 2014) ("Defendants 'ha[ve] the burden, as the moving parties, to demonstrate conclusively'" that the elements of fraudulent concealment have not been met.) (quoting *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11th Cir. 1999)).[20]

The Second Circuit applies a "lenient" standard to issues of fraud, scienter, reliance, knowledge and diligence because they are highly fact-intensive and thus "appropriate for

---

[20] *See also In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979) (burden on defendants at summary judgment to show lack of dispute about material facts as to elements of fraudulent concealment).

resolution by the trier of fact." *Meijer, Inc. v. Ferring B.V. (In re DDAVP Direct Purchaser Antitrust Litig.)*, 585 F.3d 677, 693 (2d Cir. 2009). *See also Robertson v. Seidman & Seidman*, 609 F.2d 583, 591, 593 (2d Cir. 1979) (reversing district court for resolving "conflicting inferences" about fraudulent concealment on summary judgment and explaining that where issues "are raised as to the state of mind, intent and knowledge of the parties[,] [w]e have repeatedly held stated that summary judgment is particularly inappropriate."); *Grynberg v. Eni S.p.A.*, 2009 WL 2482181, at *7 (S.D.N.Y. Aug. 13, 2009) (denying summary judgment, determining that "[t]he inherent difficulty of determining who knew or should have know [sic] what when, and what each individual should have concluded from what he knew or should have known, precludes the court from determining when the Plaintiffs discovered the fraudulent concealment."); *Harding v. Naseman*, 2008 WL 4900562, at *9 (S.D.N.Y. Nov. 14, 2008) ("whether Plaintiff exercised 'reasonable diligence' to discover the alleged fraud [is a] question of fact [that] should be determined at trial, and not through avernments [sic] in a motion for summary judgment."); *N.Y. ex rel. Spitzer v. Feldman*, 2003 WL 21576518, at *5 (S.D.N.Y. July 10, 2003) (denying summary judgment on fraudulent concealment because when plaintiff learned of its cause of action and whether it had exercised diligence "are issues for the jury to decide."); *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 345-46 (S.D.N.Y. 1999) (collecting cases and explaining that "in the context of a summary judgment motion, this Court has noted the care that must be taken in deciding such a motion, because the question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide"); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 75 (S.D.N.Y. 1996) ("issues of constructive knowledge depend on inferences drawn from the facts of each particular case, summary judgment is often inappropriate on issues on inquiry notice."); *Morton's Mkt., Inc.*, 198 F.3d at 832 ("we have held, along with a majority of

the circuits, that the issue of when a plaintiff is on 'notice' of his claim is a question of fact for the jury."); *id.* ("as a general rule, the issue of when a plaintiff in the exercise of due diligence should have known of the basis for his claims is not an appropriate question for summary judgment."); *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1170 ("[T]he question of when the statute of limitations began to run on the plaintiffs' cause of action is a factual one and is therefore not determinable on a motion for summary judgment.") (citation omitted).

Accordingly, Defendants' burden on summary judgment as to Plaintiffs' fraudulent concealment claims is onerous: "cases in this court have highlighted the extent of the defendant's burden at this stage of the litigation, describing it as 'extraordinary' and positing that summary judgment is appropriate only in 'extreme circumstances.'" *Thompson*, 149 F. Supp. 2d at 49-50 (quoting *In re Prudential Sec. Inc.*, 930 F. at 75). *See also Grynberg*, 2009 WL 2482181, at *5 ("Defendant must carry a heavy burden before the court will dismiss Plaintiffs' fraudulent concealment allegation without trial."). Thus, in *Grynberg*, Judge Carter determined that even though

> Defendant has introduced a considerable body of evidence which indicates that Plaintiffs may well be unable to prove fraudulent concealment or that, on the other hand, Defendant will be able to prove Plaintiffs' awareness of the fraud prior to July 2006, Defendant has not shown that there are no material factual disputes warranting trial. Summary judgment is therefore precluded and the question of Plaintiffs' entitlement to the tolling of the statute of limitations proceeds.

2009 WL 2482181, at *7.[21]

---

[21] Likewise in *Morton's Market, Inc.*, the Eleventh Circuit reversed a grant of summary judgment in an antitrust case because "[i]t [wa]s not enough for summary judgment to point to facts which *might* have caused a plaintiff to inquire, or *could* have led to evidence supporting his claim. A defendant who does this has succeeded in demonstrating only that there is a jury question regarding the tolling of the statute of limitations by fraudulent concealment. To award summary judgment on such a showing is error." 198 F.3d at 832-33 (emphases in original).

## 2. There Is a Material Dispute About Whether Defendants Concealed the No-AG Clause

With respect to the first prong, whether Defendants' concealed Plaintiffs' cause of action, "the Second Circuit 'has adopted the more lenient standard requiring plaintiffs to prove concealment by showing either that the defendants took affirmative steps to prevent plaintiffs' discovery of the conspiracy, or that the conspiracy itself was inherently self-concealing.'" *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425, at *13 (S.D.N.Y. Aug. 18, 2017) (Hellerstein, J.) (quoting *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000)), *vacated on other grounds*, 991 F.3d 370 (2d Cir. 2021). With respect to this prong, there is a genuine dispute of fact.

Par and Novartis took affirmative steps to prevent Plaintiffs' discovery of the conspiracy by negotiating a confidentiality provision that required Defendants to conceal and not disclose the NPLA's terms without permission from the other side. RSoF ¶ 109. Neither Par nor Novartis granted such permission to the other to disclose that the NPLA prohibited Novartis from launching authorized generic Exforge for the 180 days following Par's generic Exforge launch on September 30, 2014. *Id.* There is no evidence that either Defendant disclosed the No-AG clause to any Plaintiff, and Par's Mr. Campanelli testified that no such breach of the NPLA occurred. *Id.* Defendants' concealment was so effective that not even Novartis's high-level executives knew that the NPLA contained a No-AG clause. *See* ECF No. 513-4. Specifically, David Catalano, Novartis's Director, Brand Maximization and Established Medicines, informed others at Novartis on September 30, 2014: "Sandoz is not launching the AGx [AG Exforge] until day 181 (NOT FOR PUBLIC USE)." *Id.*, NPC_01902341, at -343. Novartis's Senior Associate Director National Accounts then asked "Why won't Sandoz be launching at the time of Par's launch?" *Id.* at -342. Novartis's Executive Director, Wholesaler/Retail Channels and Pharmacy Affairs, did not know

17

either. *Id*. at -341.

Accordingly, prior to Novartis's AG Exforge launch following day 181 after Par's (belated) generic Exforge launch, it would have been reasonable for Plaintiffs to believe that Novartis had independently decided not to launch an authorized generic for business reasons rather than part of an illicit conspiracy. Indeed, in denying the existence of a No-AG clause, Par's Mr. Campanelli testified that he believed Novartis would not launch an AG for business reasons that "had nothing to do with Par." RSoF ¶ 109. While Plaintiffs dispute this self-serving after-the-fact testimony as contrary to the weight of the evidence (RSoF ¶ 64), Defendants should not be allowed for purposes of this motion to argue both that the NPLA did not have a No-AG clause and that Plaintiffs should have been on notice that it contained such a clause. *See, e.g.*, *Sonterra Capital Master Fund Ltd.*, 277 F. Supp. 3d at 568 (referring to the "breathtaking inconsistency" of defendants' arguments in a similar situation).

Defendants' cases are nothing like this one, where the anticompetitive promise was not disclosed. In *Niaspan*, for instance, the settlement agreements were publicly disclosed and filed with the SEC, and revealed the "structure of the agreed-upon payments," *that the settlement contained a No-AG clause*, the existence of "related contracts" and the specific "dollar amounts" of the reverse payments. 42 F. Supp. 3d at 745, 748. In *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, a consent judgment that served as part of plaintiffs' scheme allegations was "part of the court record," and "the parties did not agree to keep the judgment confidential." 261 F. Supp. 2d 188, 223 (E.D.N.Y. 2003). Moreover, the generic in *Ciprofloxacin* made a public SEC filing that "explains that the [reverse] payments from Bayer [the brand] to the Barr [generic] Escrow Account were expected to be from $ 24 million to $ 32 million per year until 2003." *Id*. The court concluded that defendants had not concealed their agreements but had "affirmatively disclosed these terms to

18

the public." *Id.* In *Aggrenox*, the defendants issued press releases disclosing the existence of side deals in the settlement of patent litigation, the archetype reverse-payment, prompting an "FTC investigation and other litigation challenging the agreement." 94 F. Supp. 3d at 236, 249. Finally, in *In re Lamictal Indirect Purchaser & Antitrust Consumer Litigation*, as here, plaintiffs argued that defendants' public disclosures omitted that the brand agreed not to launch an authorized generic for 180 days following the generic's launch. However, unlike this case, "the terms of the No-AG Commitment were publicly disclosed in a [subsequent] lawsuit between [the brand] and [the generic]." 172 F. Supp. 3d 724, 746 (D.N.J. 2016). Specifically, the generic in *Lamictal* alleged in its complaint that "GSK [agreed it] would not sell a generic equivalent for a limited period of time," and the brand publicly "filed a redacted copy of the settlement agreement containing the material terms of the No-AG Commitment." *Id.*

This case closely resembles *In re Glumetza Antitrust Litigation*, where the brand and generic settled, and the generic vaguely disclosed its expectation that there would not be an authorized generic. 2021 WL 1817092, at *15-16 (N.D. Cal. May 6, 2021). *Glumetza* held that the "hazy record" "permits a jury to conclude plaintiffs did not have constructive notice of the no-AG provision" and denied defendants' motion for summary judgment. *Id.* at *16. This case is also like *In re Skelaxin Metaxalone Antitrust Litigation*, where defendants publicly filed their settlement agreement but redacted the reverse payment and the Court declined to dismiss the plaintiffs' fraudulent concealment allegations. 2013 WL 2181185, at *31. Finally, in *In re EpiPen*, another reverse payment case, plaintiffs alleged fraudulent concealment because they could not have been aware of their claims until the United States Congress began investigating defendants' practices, making some of them public. 545 F. Supp. 3d 922, 1019 (D. Kan. 2021). The court determined that "[i]t can't decide this issue on summary judgment. Whether plaintiffs diligently pursued their

claims, thus permitting them to avail themselves of the various tolling doctrines, is a factual issue that the jury must decide at trial." *Id*. (collecting cases). The jury in this case should also evaluate fraudulent concealment at trial.

Defendants also argue that Par's statements cannot support a finding of fraudulent concealment because they had no duty to disclose the NPLA's unlawful nature. Defs.' Br. 6-7. But as the Court explained in *Butala v. Agashiwala*, "[a]lthough it is doubtful that the defendants owed the plaintiffs a fiduciary duty . . . 'it is nonetheless fundamental that a person who speaks has a duty to disclose enough to prevent his words from being misleading. A statement disclosing favorable information but omitting all reference to material unfavorable facts breaches that duty. This principle is plainly applicable to the question of whether a defendant has engaged in fraudulent concealment.'" 1997 WL 79845, at *8 (S.D.N.Y. Feb. 24, 1997) (citing *Baskin*, 807 F.2d at 1132). *See also Bennett Silvershein Assocs. v. Furman*, 1997 WL 531310, at *6 (S.D.N.Y. Aug. 28, 1997) (omissions may be fraudulent "[e]ven where this is no fiduciary relationship."); *Glumetza*, 2020 WL 1066934, at *7 ("[H]alf-truths – representations that state the truth only so far as it goes, while omitting critical qualifying information – can be actionable misrepresentations. One who chooses to speak has a duty to include as much information as necessary to prevent misleading others.") (internal quotation marks omitted).

Here, the evidence shows that Defendants concealed the existence of the No-AG provision and further that Par misled Plaintiffs with half-truths about the nature of the NPLA. Assuming, as the Court must at this stage, that the NPLA contained a No-AG clause, and resolving all inferences in Plaintiffs' favor, then Mr. Campanelli's testimony that Par disclosed only its alleged "beliefs" that Novartis would not launch an AG but *not* the No-AG clause (RSoF ¶ 109), is an admission that Par led astray the Plaintiffs it communicated with. None of Defendants' cases involve such

active misleading. Defs.' Br. at 7. Instead, Defendants' cases support Plaintiffs. For instance, in *Benchmark Export Services v. China Airlines, Ltd. (In re Air Cargo Shipping Services Antitrust Litigation)*, defendant "implicitly suggested that the [challenged] surcharges were legitimate and resulted from competitive market forces." 2010 WL 10947344, at *16 (E.D.N.Y. Sept. 22, 2010). The court determined that plaintiffs' allegations "hardly constitute overwhelming proof," but "are sufficient at this stage," because "they go beyond mere silence or failure to 'own up' to illegal conduct." *Id*.

The NPLA was also inherently self-concealing, which also satisfies the first prong of fraudulent concealment. As mentioned above, the NPLA contained a confidentiality clause and there is no suggestion in this case that either Novartis or Par breached that provision. RSoF ¶ 109. There was good reason for Defendants' insistence on confidentiality, since as of the December 2, 2011 date of the NPLA, the question of whether reverse payments were unlawful was an unresolved issue. There was not, as Defendants incorrectly argue, judicial consensus at the time that reverse payments were lawful. Defs.' Br. 7-8. Rather, the D.C. and Sixth Circuits deemed them *per se* unlawful, and the Court of Appeals for the Third Circuit, which encompassed the New Jersey headquarters of both Novartis and Par at the time, had, before the NPLA, taken up the question and ruled in 2012 that reverse payments are presumptively anticompetitive and subject to the "quick-look" mode of analysis. *See Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003); *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 218 (3d Cir. 2012). And of course the Supreme Court ultimately ruled that reverse payments are subject to antitrust scrutiny under the Rule of reason, in *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013). Had Defendants disclosed their No-AG agreement, their

conspiracy may have been stopped in its tracks.[22]

Defendants claim that "courts have routinely held that the 'self-concealing' exception does not apply to reverse-payment settlements." Defs.' Br. 7-8. But none of the cases they cite involve disclosure only of the existence of a license, or contractual provisions requiring the confidentiality of all other terms.

### 3. Plaintiffs Had No Reason to Suspect that Novartis Had Agreed to a No-AG Clause Until March 31, 2015, When Novartis Began Selling AG Exforge 181 Days After Par's Generic Launch

With respect to the second prong of the fraudulent concealment analysis, Defendants argue that there is no genuine issue of material fact that Plaintiffs knew of their cause of action more than four years before filing their complaints. In support of this argument, Defendants dishonestly misquote the Direct Purchaser Complaint. Specifically, they argue that "DPPs state that they 'detected . . . suspicious conduct' by the time of 'Novartis's failure to launch an authorized generic upon Par's September 30, 2014 entry of generic Exforge.'" Defs.' Br. 15 (misquoting Compl. ECF No. 47) (ellipses added by Defendants). But the only word Defendants' ellipses excised was "no." Defendants' misleading use of ellipses to remove the word "no" completely inverts the meaning of DPPs' allegation.[23] And as discussed elsewhere, the evidence bears out that Plaintiffs' further

---

[22] The disclosure of the NPLA to the DOJ and the FTC does not defeat fraudulent concealment. Those disclosures are exempt from FOIA and are unavailable to the public. RSoF ¶ 67. In addition, the FTC has been clear that it is inappropriate to infer approval by lack of agency action. *See* https://www.ftc.gov/system/files/attachments/competition-policy-guidance/mma_pharmaceutical_agreement_filing_faq_6-6-19.pdf last accessed June 16, 2022 ("A lack of action by the Commission or its staff with respect to a filed agreement does not signify an implicit approval of the agreement or a lack of antitrust concern. In addition, the MMA expressly provides that FTC inaction concerning a filed agreement is not a bar to any later antitrust action. **Any suggestions by drug companies to courts or others that FTC inaction indicates that the agreement presents no antitrust problem would be inaccurate and improper.**") (emphasis added).

[23] In a similarly egregious example of Defendants' playing fast-and-loose with the facts, they added the word "a" to the following quote from ¶ 132 of their statement of facts, giving the false impression that the witness was asked about the existence of a No-AG clause rather than, generally, whether Novartis would *(continued on next page)*

detected "***no*** suspicious conduct" prior to March 31, 2015.

Defendants also reference publicly available information and certain private disclosures. None of the disclosures revealed that Novartis and Par agreed to a No-AG provision.

a) ***There Was No Publicly Available Information That Would Have Put Plaintiffs on Notice of Their Claims***

Defendants make four arguments that Plaintiffs were on notice of their claims more than four years before the filing of the class complaints. *First*, they argue that Par and Novartis made three disclosures to the SEC or financial analysts that Par was expected to launch AG Exforge in October 2014 under a license agreement. But this disclosure did not put Plaintiffs on notice that Novartis promised not to launch an authorized generic for 180 days after Par's generic launch. Unlike the defendants in *Ciprofloxacin* or *Niaspan*, Defendants did not disclose the other terms of the agreement and did not publicly file it. Moreover, a license agreement is not ordinarily unlawful. As the Supreme Court explained in *Actavis*, only a large and unexplained reverse payment in a license is subject to antitrust scrutiny. *Actavis*, 570 U.S. at 154.[24] Here the reverse payment was not reasonably apparent until Novartis launched its AG on precisely day 181 after Par's generic launch – a length of time commonly utilized in No-AG deals because it coincides with the first generic's 180-day FDA regulatory exclusivity. *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 393 (3d Cir. 2015); *Glumetza*, 2020 WL 1066934, at *3, *7; *In re*

---

launch an AG: "When asked at deposition if 'Par concealed that there would be ***a*** no AG from McKesson,' ██████████████████████████████████████████████████████ (Emphasis added). The word "a" appears nowhere in the actual transcript or video record of the deposition and ██████████████████████████████████████████

[24] "We concede that settlement on terms permitting the patent challenger to enter the market before the patent expires would also bring about competition, again to the consumer's benefit. But settlement on the terms said by the FTC to be at issue here—payment in return for staying out of the market—simply keeps prices at patentee-set levels, potentially producing the full patent-related . . . monopoly return while dividing that return between the challenged patentee and the patent challenger. The patentee and the challenger gain; the consumer loses." *Id.*

*Niaspan*, 42 F. Supp. 3d at 741.

*Second*, Defendants argue that Plaintiffs' allegations based on publicly available information that Novartis's patents were weak mean that they were necessarily on notice that the NPLA contained a reverse payment. Not so. It does not necessarily follow from the weakness of a patent that the brand manufacturer made a reverse payment. As the Supreme Court recognized, litigants may "settle in other ways, for example, by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point." *Actavis*, 570 U.S. at 138. Such no-payment settlements may be reached regardless of whether a patent is strong or weak. Insofar as Defendants argue that Plaintiffs "continue to assert that there was no possibility that Par would decide on its own not launch at risk in 2012" without a reverse payment (Defs.' Br. 10), Plaintiffs' continued assertions follow extensive discovery.

*Third*, Defendants claim that financial services firm Leerink Swan issued a note to investors that "suggested that the deal may have limited Novartis's ability to launch an authorized generic." Defs.' Br. 11. But the Leerink Swan note did no such thing. It merely *speculated* that "the Travatan Z and Exforge settlements ***could*** represent significant upside ***if*** they were structured similarly to the Rhythmol settlement (*e.g.*, ***possible*** exclusivity parking deals.)" ECF No. 504-8 (emphases added). Leerink Swan did not claim to know or to have been told by Novartis or Par that the Exforge settlement included a No-AG agreement. There was nothing in the Leerink Swann report on which Plaintiffs could have filed a good faith complaint against Defendants. *See City of Pontiac Gen. Emples. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) ("Only after a plaintiff can adequately plead his claim can that claim be said to have accrued, and only after a claim has accrued can the statute of limitations on that claim begin to run."). When Novartis

attempted to determine the source of Leerink Swan's knowledge of an Exforge settlement so soon after the NPLA had been signed, it determined that the source was Par's disclosure of the entry date *only*, not of the No-AG provision. RSoF ¶¶ 109, 111.

*Finally*, Defendants refer to two FTC publications. The first is an August 2011 report generally about reverse payments. Defendants claim that different plaintiffs in a different case have "admitted" that this report "'was the impetus for knowledge' that such agreements were anticompetitive." Defs.' Br. 11 (citing *Lamictal*, 172 F. Supp. 3d at 746 n.4). But general knowledge that reverse payments are anticompetitive is a far cry from knowledge of the existence of a particular reverse payment.

The second FTC publication analyzed settlements from October 1, 2011 and September 30, 2012. Skaistis Ex. 64 at 1. To the extent this second FTC publication has any significance to the instant motion, the FTC determined that of 140 settlements, only 19 (13.5%) were "potential" No-AG deals. *Id*. Thus, until Novartis's AG launch precisely on day 181 after Par's generic launch, from Plaintiffs' perspective, it was overwhelmingly (86.5%) likely that the NPLA *did not* contain a No-AG clause. Similarly, an analysis of the FDA's National Drug Code Directory, which lists "all drugs manufactured, prepared, propagated, compounded or processed for sale in the United States,"[25] shows that there are 7,867 marketed brand (NDA) drugs and only 1,444 authorized generic drugs.[26] In other words, only approximately 18% of brand drugs have an authorized generic. Consistent with all of the above, Novartis lists over 100 currently marketed drugs on its website,[27] but has only ever launched 21 authorized generics according to publicly available

---

[25] https://www.fda.gov/drugs/drug-approvals-and-databases/national-drug-code-directory.

[26] The FDA makes its data available to download at https://www.accessdata.fda.gov/cder/ndcxls.zip.

[27] https://www.novartis.us/product-list.

information from the FDA.[28] There was no reason for any Plaintiff or class member to assume from these general industry observations that Novartis and Par had entered into an illegal no-AG agreement to resolve their patent litigation.

Defendants assert that Plaintiffs should have recognized that they had a claim against Defendants because FTC data shows that in 2011 roughly 23 out of 43 (53%) of settlements between brand companies and first-to-file generics (as distinct from all generics) contained a reverse payment. Defs.' Br. 11-12. But the cited data refers only to "potential" reverse payments. Skaistis Ex. 64 at 1. Moreover only 19 of these 23 "potential" reverse payments (out of 40 settlements overall) were "potential" No-AG agreements, so fewer than half of settlements between brand companies and first-to-file generics contained potential No-AG clauses. *Id*. More fundamentally, however, Defendants' argument amounts to a rule requiring plaintiffs to file lawsuits whenever their chances of guessing correctly are no better than a statistical coin flip on the basis on unrelated evidence from other cases. Such a rule would clog the courts with baseless suits. And, of course, had Plaintiffs based their allegations on nothing more than a coin flip guess, Defendants would no doubt have argued that such allegations violate Rule 11. Fed. R. Civ. P. 11(a)(3) ("By presenting to the court a pleading . . . an attorney . . . certifies that . . . the factual contentions have evidentiary support or, if specifically so identified, *will likely* have evidentiary support.") (emphasis added).

> **b)**     ***Defendants' Pre-Limitations Period Disclosures to Some Plaintiffs Did Not Put Them on Notice of Defendants' No-AG Agreement***

Defendants claim that McKesson and its assignees CVS and HEB were on notice of their claims more than four years prior to the filing of Plaintiffs' complaints because of certain

---

[28] https://www.fda.gov/media/77725/download.

disclosures made at trade conferences. At most, these disclosures advised Plaintiffs that there would not be an authorized generic version of Exforge upon Par's launch of generic Exforge. But there is nothing inherently suspicious about a brand's decision not to launch an authorized generic because brand companies do not always launch authorized generic drugs. DPPs' allegation that there was "'no economic sense' in Novartis delaying an authorized generic" was made *after* it was clear that Novartis waited exactly 181 days to launch an authorized generic. Contrary to Defendants' claim (Defs.' Br. 16), that allegation says nothing about whether it was reasonable for Plaintiffs to conclude *before* Novartis's belated launch that Novartis's decision not to launch an AG was the result of collusion. In *FrontPoint*, this Court rejected a similar argument that plaintiff was on notice of its claims because "the data used to construct plaintiffs' 'economic evidence' was available during the limitations period, and was therefore not concealed." The Court held that if such an argument were adopted, "fraudulent concealment would never be available to plaintiffs in the antitrust context because data regarding the affected price is always available to the public throughout the duration of the conspiracy." 2017 WL 3600425, at *13.

Defendants further claim that Novartis's failure to launch an authorized generic when Par launched its generic "should [have] excite[d] [P]laintiffs' suspicion." Defs.' Br. at 9, 15 (citing *Ciprofloxacin*, 261 F. Supp. 2d at 225). But that begs the question: suspicion of what? "[T]he critical determinant" of whether a plaintiff had knowledge is "when 'a significant fact emerges.'" *Ciprofloxacin*, 261 F. Supp. 2d at 225 (quoting *Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504, 509 (S.D.N.Y. 1989)). But the lack of an authorized generic in and of itself is not a particularly "significant fact," as detailed above. *Supra* § III.B.3.a. Defendants' conduct was not suspicious until Novartis launched AG Exforge 181 days – to the day – after Par launched its generic version of Exforge. Defendants' cases (Defs.' Br. 15) do not help them. As explained above, in *Niaspan*

and *Ciprofloxacin*, the "significant fact" was that the reverse payments were fully disclosed shortly after the agreements were reached. And, in *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975), the "significant fact" was preceding Congressional hearings and FTC testimony about the defendants' unlawful conduct, circumstances that are not present here.

Defendants' rule would require Plaintiff to file a lawsuit whenever a brand company decides not to launch an authorized generic to compete with an ANDA generic. But "most settlements between brand and generic makers do not include reverse payments . . . over 80 percent of brand-generic settlements reached within the year following [*FTC v.*] *Actavis* did not include a reverse payment." *Impax Lab'ys., Inc. v. FTC*, 994 F.3d 484, 499 (5th Cir. 2021).

### c) There Is a Material Dispute About Plaintiffs' Diligence

With respect to the third prong, Defendants argue that "entities that conducted due diligence were able to learn of their claims prior to May 16, 2014." Defs.' Br. 18. This assertion is disputed. As explained above, no Plaintiff learned of its claims before March 31, 2014. Moreover, as this Court has explained, Defendants' argument "overstates the standard." *FrontPoint*, 2017 WL 3600425, at *13. Plaintiff can defeat summary judgment on this prong by raising a material fact about whether "it was defendants' concealment, and not a lack of diligence on their part, that prevented them from knowing their claim." *Id*. Defendants concealed their reverse payment by incorporating a confidentiality provision in the NPLA, abiding by it with respect to the No-AG clause, and disclosing only "half-truths" about the anticompetitive nature of the NPLA by disclosing only Par's entry date and not the No-AG clause. In the face of this concealment, no amount of "diligent inquiry by the plaintiffs would have actually uncovered any anti-competitive conduct." *Precision Assocs*., 2011 WL 7053807, at *52 (quoting *Benchmark*, 2010 WL 10947344,

28

at *19). If Defendants' conduct "were curious, even somewhat suspicious, [it] did not provide notice to the plaintiffs. Due diligence does not demand such unmitigated cynicism." *Id*.

In any event, contrary to Defendants' argument that diligent inquiry would have uncovered their illegal conduct, the evidence that they cite shows precisely the opposite. Specifically, Defendants claim that some Plaintiffs inquired at industry conferences about Par and Novartis's launch plans for generic or AG products. These Plaintiffs only learned of Par's generic Exforge entry date or that Novartis would not be launching AG Exforge. Defs.' Br. 18-19. There is no evidence or reason to believe that any additional inquiry would have led to the discovery of the NPLA's No-AG clause, particularly since Defendants continue to deny its existence to this day. *See Stone v. Williams*, 970 F.2d 1043, 1049 (2d Cir. 1992). ("Any duty to inquire only charges the plaintiff with "whatever knowledge an inquiry *would have revealed*.") (emphasis added).

## C.   State Limitations Statutes Do Not Bar EPPs' Claims

End-Payor Plaintiffs ("EPPs") maintain claims under the laws of 22 states, all of which recognize fraudulent concealment or a sufficiently similar tolling doctrine. All 22 states also either recognize the continuing violation doctrine or, based upon state antitrust harmonization laws, would recognize the continuing violation doctrine in this case.[29]

### 1.      *EPPs Can Demonstrate Fraudulent Concealment*

Apart from repeating the same failed arguments raised against DPPs, Defendants also assert EPPs had actual or constructive notice of their claims through their relationship with Express Scripts, a Pharmacy Benefit Manager ("PBM"). Both contentions are baseless. Defendants fail to show that Express Scripts was aware or had any reason to suspect that there was an unlawful No-

---

[29] Nineteen states have a statute of limitations of four years, and three (Maine, Vermont, and Wisconsin) have a statute of limitations of six years. EPPs' state law charts on fraudulent concealment and continuing violation or continuous accrual doctrine are attached at Appendices A and B, respectively.

AG clause, and so their argument fails on this basis alone. *See supra* § III.B.2. Certainly, if Express Scripts had no actual or constructive knowledge of the unlawful No-AG provision then the EPPs could not have been put on notice via Express Scripts.

And there is no evidence that Express Scripts passed any (non-existent) knowledge along to the EPPs. Defendants speculate that EPPs had actual notice because EPPs UFCW Local 1500 Welfare Fund ("UFCW") and Law Enforcement Health Benefits Inc. ("LEHB") retained Express Scripts to "monitor" upcoming generic product launches. Never mind that Defendants fail to show any evidence that EPPs knew when the first generic Exforge product would launch; Defendants offer nothing demonstrating that Express Scripts transmitted any information about the NPLA (let alone the No-AG clause) to either EPP.[30] Nor do they demonstrate that Express Scripts knew *why* there would be no AG on the market, meaning that not even Express Scripts knew of the unlawful No-AG provision. *See supra* § III.B.2. It would be improper to grant summary judgment based on Defendants' half-baked speculation.

Attempting to sidestep the problem of actual notice, Defendants claim EPPs had imputed notice, supposedly because Express Scripts operated as an agent for UFCW and LEHB. *See* Defs.' Br. 25. But this Court has rejected that PBMs are agents of their health benefit fund clients. *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 607-08 (S.D.N.Y. 2005). The touchstone of agency "is the principle that '[a] principal has the right *to control the conduct of the agent*[.]'" *Id.* (quoting Restatement (Second) of Agency § 1(1) (emphasis added)). Health benefit fund clients have "no ability to control" PBMs, which, as independent entities, operate their "own vast and complex business" to provide pharmacy services for thousands of clients. *See id.* In addition, both

---

[30] ████████████████████████████████████████████████████████████████ RSoF ¶ 217 (Gaittens (LEHB) Dep. Tr. 140:17-22).

UFCW's and LEHB's contracts with Express Scripts "specifically disclaim[ ] agency relationship" with Express Scripts, *id.*, and those contracts ███████████████████████████████████

███████████████████████████████████[31] Nothing in the record elevates EPPs' "mere contractual" relationship with Express Scripts to one involving agency (or one that would support imputed knowledge).[32] *See Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 278 (2d. Cir. 2013) (stating the right to control distinguishes agency from a contractual relationship).

Finally, as noted above, reasonable diligence, as an issue of fact related to Defendants' statute of limitations defense, must be submitted to the jury, *and* Defendants have not met their burden to show that with respect to the EPPs' diligence, there are no material issues of fact. *See* § III.B.1 at 15-16, *supra* (collecting cases). Defendants themselves allege that EPPs conducted at least some diligence by hiring Express Scripts as a PBM (Defs.' Br. 26); whether this was "reasonable" is a question for the factfinder. In addition, a reasonably diligent plaintiff might also conduct no independent investigation, particularly in the circumstances present here where EPPs lacked any red flags prior to Novartis's delayed AG launch. *See* § III.B.3.a. and c., *supra*; *see also In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 1007 (N.D. Ohio 2015) ("The degree of investigation (if any) the plaintiff must undertake depends on the nature of the red flags a reasonable person should have had knowledge of."). Again, this is a question for the fact finder.

Defendants also ignore that reasonable diligence "merely measures what a reasonably diligent plaintiff would or could have known regarding the claim." *Stone*, 970 F.2d at 1049. Any

---

[31] RSoF ¶ 210 (quoting UFCW and LEHB PBM Agreements with Express Scripts).

[32] Express Scripts further submitted a declaration in this case where it states that, as of 2018, it offered PBM services to more than 3,000 clients. RSoF ¶ 210 (citing ECF 426-04, ESI Declaration ¶ 3). Express Scripts does not characterize itself as an agent for its clients anywhere in its Declaration. RSoF ¶ 210 (citing ESI Declaration as whole).

Defendants also fail to point to any testimony or agreement that indicates Express Scripts was required to communicate the information discussed by Par's former CEO, Paul Campanelli, to EPPs.

duty to inquire only charges the plaintiff with "whatever knowledge an inquiry *would have revealed*." *Id.* (emphasis added). Defendants must demonstrate that EPPs' investigation, undertaken at the time the duty was triggered, would have yielded sufficient facts to file a complaint. *See Morton's Mkt., Inc.*, 198 F.3d at 832 (stating the moving party has the burden to prove that had plaintiffs "exercised reasonable diligence, they would have discovered adequate grounds for filing this antitrust lawsuit during the limitations period."); *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1171; *Allen*, 2014 WL 2610613, at *23; *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 10947344, at *18 ("The requisite notice required to defeat a claim of fraudulent concealment is an awareness of sufficient facts to identify . . . the particular cause of action at issue, not [notice] of just any cause of action.").

Mr. Campanelli's testimony in no way demonstrates that EPPs could have adduced sufficient facts upon which to file a complaint. Notwithstanding Defendants' lack of evidence suggesting Express Scripts communicated any information it received from Par to EPPs or that EPPs had a reason to seek out that information from Express Scripts, Mr. Campanelli's vague statement that Par would "be coming in September 2013 [sic], again, without an . . . AG" does not indicate an agreement between Par and Novartis, let alone an unlawful one.[33] Courts routinely hold that defendants fail to meet their summary judgment burden for the statute of limitations where the purported notice to plaintiffs does not indicate the existence of a conspiracy or other unlawful

---

[33] There are many reasons why Mr. Campanelli's testimony should not be taken at face value, including that Par did not launch its generic Exforge until September 30, 2014 (and not September 2013). In purportedly recalling communications with Express Scripts, Mr. Campanelli speculated that Par "would have been forced" to disclose the late generic entry, not that such information was actually communicated to Express Scripts. RSoF ¶ 210. Mr. Campanelli also gave no details as to who at Par would have communicated this information or which employee at Express Scripts would have received it. Simply put, Mr. Campanelli's recollection lacks credibility.

conduct. *See* III.B.3.a and c, *supra*.[34]

## 2. *EPPs Can Demonstrate Continuing Violations*

As discussed above, under the continuing violation doctrine, a purchaser's overcharge claim accrues, and therefore a separate statute of limitations begins to run, for each supracompetitive overcharge. *See supra* § III.A.[35] Similar to federal law, many states have adopted this rule to apply to antitrust claims, either affirmatively or by provisions in their antitrust statutes that harmonize those laws with federal antitrust law and corresponding federal antitrust doctrines. *See* Appendix B, appended hereto. So, the question is not whether Defendants perpetrated a "continuing course of conduct"—that is irrelevant. Defs.' Br. 27. Rather, because EPPs incurred overcharges throughout the Class period,[36] the continuing violation doctrine protects all claims within that four or six-year period prior to first the EPP filing on June 19, 2018.[37]

Defendants' Appendix B only amplifies their confusion about the continuing violation doctrine. For the most part, Defendants cite cases discussing the nuances of state tort doctrine, not the antitrust rules states would apply, particularly in light of state harmonization authority. As discussed in Section III.A, *supra*, every circuit court that has considered the continuing violation doctrine has applied the Supreme Court's *Klehr* decision to permit a new claim for each overcharge. Defendants cite nothing in their brief or Appendix indicating that any Class state

---

[34] Although Defendants deny the existence of the fraudulent concealment doctrine in Wisconsin, that state recognizes a sufficiently similar tolling doctrine. *See* Appendix A, appended hereto. Wisconsin also operates under the discovery rule, which is equivalent to fraudulent concealment. *See id.*

[35] Some courts have distinguished between the continuing violation doctrine and continuous accrual doctrine, whereas the former refers to situations where Defendants perpetrate a series of wrongs, and the statute of limitations is tolled until the date of the last wrongful act. This is not the meaning argued by EPPs.

[36] RSoF ¶ 261 (quoting Conti Rpt. ¶¶ 66, 71-74, 77).

[37] Defendants cite this Court's previous ruling, but that order only applied to dismiss the antitrust claims for Kansas, Mississippi, and Tennessee and the unjust enrichment claims of multiple states. Defs.' Br. 26-27. This Court should decide this motion on the facts and law presented here.

would not also apply the same rule. But even assuming the tort cases cited by Defendants are relevant, EPPs have the better argument for why the continuing violation doctrine protects their claims: each overcharge is synonymous with an independent economic harm to the consumer, so under state tort law, the statute of limitations runs anew for each harm that occurs. It is nonsense to suggest that the state cases in Defendants' Appendix B would preclude a plaintiff from asserting a separate claim for each tortious act (or economic harm) here.

Defendants also incorrectly argue that the EPPs' claims in Maine, Nevada, and Vermont should be dismissed because those states do not recognize the continuing violation doctrine in the context of antitrust claims. Defendants are wrong.[38] For Maine, the *McKinnon* case cited by Defendants states that the continuing violation doctrine could not be used to revive a claim that accrued outside the limitations period; however, the *McKinnon* court recognized that an antitrust cause of action under Maine law accrues anew upon each purchase of the product sold within the limitations period. *McKinnon v. Honeywell Int'l, Inc.*, 977 A.2d 420, 425-26 (Me. 2009). And contrary to Defendants' argument, the Nevada Supreme Court would apply the continuing violations doctrine in harmony with prevailing judicial interpretations of the federal antitrust laws. *Nev. Recycling & Salvage, Ltd. v. Reno Disposal Co.*, 423 P.3d 605, 607 (Nev. 2018) (applying mandatory federal harmonization provision).[39] Finally, the Vermont Supreme Court has not determined if the continuing violation doctrine would apply to antitrust claims as such, but Vermont favors harmonization. *See* Appendix B.

---

[38] *See* Appendix B (appending list of state law adopting the continuing violation doctrine).

[39] The Nevada Supreme Court opinion cited by Defendants declined to consider the continuing violation doctrine on an insufficient record. *See State v. Wyeth*, 373 P.3d 964, at *1 & n. 1 (Nev. 2011) (table).

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment on the Statute of Limitations.

Dated: June 23, 2022     Respectfully submitted:

           */s/ Dan Litvin*

Kristyn Fields
FARUQI & FARUQI, LLP
685 Third Ave., Floor 26
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: kfields@faruqilaw.com

Peter Kohn
Joseph T. Lukens
FARUQI & FARUQI, LLP
1617 JFK Blvd., Suite 1550
Philadelphia, PA 19103
Tel: (215) 277-5770
Email: pkohn@faruqilaw.com
Email: jlukens@faruqilaw.com

David F. Sorensen
Caitlin G. Coslett
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: dsorensen@bm.net
Email: ccoslett@bm.net

*Attorneys for Plaintiff Rochester Drug*
*Co-Operative, Inc. and the Direct*
*Purchaser Class*

Bruce E. Gerstein
Joseph Opper
Dan Litvin
Deborah Elman
GARWIN GERSTEIN & FISHER LLP
88 Pine Street, 10th Floor
New York, NY 10005
Tel: (212) 398-0055
Fax: (212) 764-6620
Email: bgerstein@garwingerstein.com
Email: jopper@garwingerstein.com
Email: dlitvin@garwingerstein.com
Email: delman@garwingerstein.com

*Attorneys for Plaintiff Drogueria Betances,*
*LLC and Interim Lead Counsel for the*
*Direct Purchaser Class*

David Raphael
Erin Leger
Susan Segura
SMITH SEGURA RAPHAEL & LEGER,
LLP
221 Ansley Boulevard
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741
Email: draphael@ssrllp.com
Email: eleger@ssrllp.com
Email: ssegura@ssrllp.com

Robert N. Kaplan
Matthew P. McCahill
Ralph E. Labaton
KAPLAN FOX & KILSHEIMER, LLP
850 Third Avenue, 14th Floor
New York, New York 10022
Tel: 212-687-1980
Fax: 212-687-7714
Email: rkaplan@kaplanfox.com
Email: mmccahill@kaplanfox.com
Email: rlabaton@kaplanfox.com


Joseph M. Vanek
David P. Germaine
SPERLING & SLATER, P.C.
55 W. Monroe, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
Email: jvanek@sperling-law.com
Email: dgermaine@sperling-law.com

*Attorneys for Plaintiff FWK Holdings, LLC
and the Direct Purchaser Class*




Michael L. Roberts
Stephanie E. Smith
ROBERTS LAW FIRM, P.A
20 Rahling Circle
Little Rock, AR 72223
Tel.: (501) 821-5575
Fax: (501) 821-4474
mikeroberts@robertslawfirm.us
stephaniesmith@robertslawfirm.us

*Attorneys for Plaintiff KPH Healthcare
Services, Inc., a/k/a Kinney Drugs, Inc and
the direct purchaser class*

Stuart Des Roches
Andrew Kelly
Dan Chiorean
ODOM & DES ROCHES, LLC
Poydras Center
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078
Email: stuart@odrlaw.com
Email: akelly@odrlaw.com
Email: dchiorean@odrlaw.com


Russell A. Chorush
J. Boone Baxter
Carlos I. Ruiz
Kyle Ruvolo
HEIM PAYNE & CHORUSH LLP
1111 Bagby, Suite 2100
Houston, TX 77002
Tel: (713) 221-2000
Fax: (713) 221-2021
Email: rchorush@hpcllp.com
Email: bbaxter@hpcllp.com
Email: cruiz@hpcllp.com
Email: kruvolo@hpcllp.com

*Attorneys for Plaintiff Drogueria Betances,
LLC and the Direct Purchaser Class*




By: */s/ Robin A. van der Meulen*
Robin A. van der Meulen
Gregory S. Asciolla
Matthew J. Perez
Veronica Bosco
DICELLO LEVITT GUTZLER LLC
One Grand Central Place
60 East 42nd Street, Suite 2400
New York, NY 10165
Tel: (646) 933-1000
Fax: (646) 494-9648
rvandermeulen@dicellolevitt.com
gasciolla@dicellolevitt.com
mperez@dicellolevitt.com
vbosco@dicellolevitt.com

By: */s/ Lauren C. Ravkind*
Richard Alan Arnold
Scott E. Perwin
Lauren C. Ravkind
Anna T. Neill
KENNY NACHWALTER P.A.
Four Seasons Tower
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
sperwin@knpa.com
lravkind@knpa.com
aneill@knpa.com

*Attorneys for Plaintiffs Walgreen Co., The Kroger Co., and H-E-B, L.P.*

By: */s/ Barry L. Refsin*
Barry L. Refsin
Monica L. Kiley
Eric L. Bloom
Alexander J. Egerváry
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
Tel: (215) 568-6200
Fax: (215) 568-0300
brefsin@hangley.com
mkiley@hangley.com
ebloom@hangley.com
aegervary@hangley.com

*Attorneys for Plaintiffs CVS Pharmacy, Inc., Rite Aid Corporation & Rite Aid Hdqtrs. Corp.*

Robert G. Eisler
Kelly L. Tucker (pro hac vice)
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
reisler@gelaw.com
ktucker@gelaw.com

*Attorneys for Plaintiff Law Enforcement Health Benefits Inc. and the End-Payor Class*

37

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on June 23, 2022 the foregoing document was served on all counsel via the Court's ECF system.

Dated: June 23, 2022

*<u>/s/ Dan Litvin</u>*