## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re Novartis and Par Antitrust Litigation** | **1:18-cv-04361-AKH** |
| **This Document Relates To:** <br><br> **All Actions** | |

### REPLY IN FURTHER SUPPORT OF DEFENDANTS' MOTION
### <u>FOR SUMMARY JUDGMENT ON THE STATUTE OF LIMITATIONS</u>

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................2

I.     DPPS AND RETAILERS FAIL TO RAISE A DISPUTE OF MATERIAL FACT
      TO SAVE THEIR CLAIMS FROM THE FOUR-YEAR STATUTE OF
      LIMITATIONS..............................................................................2

        A.     Plaintiffs Fail to Raise a Dispute of Material Fact as to Fraudulent
               Concealment. ..................................................................2

              1.     Claims by McKesson, CVS, HEB, and Walgreens should be
                   dismissed...............................................................3

              2.     Defendants did not fraudulently conceal the License Agreement
                   from any other purchaser. .................................................9

              3.     The Court should not wait until after trial to dismiss untimely
                   claims. ..............................................................14

        B.     No Continuing Violation Exception Applies To Resuscitate Claims from
               May 16, 2014 Forward...............................................................15

II.    EPPS FAIL TO RAISE A DISPUTE OF MATERIAL FACT TO SAVE THEIR
      CLAIMS FROM STATE STATUTES OF LIMITATIONS...............................19

        A.     EPPs Fail To Raise a Dispute of Material Fact Regarding Fraudulent
               Concealment. ..................................................................19

        B.     EPPs Give No Reason to Depart from this Court's Prior Ruling Rejecting
               Continuing Violations. ..............................................................21

CONCLUSION....................................................................................23

i

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-CV-230, 2014 WL 2610613 (D. Vt. June 11, 2014)..............................................................................................................9

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979).....................................15

*Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, NA*, No. 14-CV-09371, 2017 WL 9400671 (S.D.N.Y. Apr. 27, 2017).........................................6

*D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485 (E.D. Pa. 2006)...................22

*Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir. 1975)...............................7

*Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423 (S.D.N.Y. 1986) .................7, 9, 21

*DXS, Inc. v. Siemens Med. Sys.*, 100 F.3d 462 (6th Cir. 1996).......................................................17

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263, 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017)................................................8, 9, 20

*Greenberg v. EPA*, 559 F. App'x 56 (2d Cir. 2014)................................................................9, 21

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968)................................15

*Humana Inc. v. Celgene Corp.*, No. 19-7532, 2022 WL 1237883 (D.N.J. Apr. 27, 2022)...........16

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F.Supp.2d 188 (E.D.N.Y. 2003).....................................................................................................7, 11, 12

*In re Glumetza Antitrust Litig.*, No. C 20-05251, 2021 WL 1817092 (N.D. Cal. May 6, 2021)..........................................................................................................10

*In re Glumetza Antitrust Litigation*, No. C 20-01198, 2020 WL 1066934 (N.D. Cal. Mar. 5, 2020)..................................................................................................6, 10

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007)...........22

*In re Rezulin Products Liability Litigation*, 392 F. Supp. 2d 597 (S.D.N.Y. 2005).....................20

*In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, 2022 WL 2438934 (D. Del. July 5, 2022)..........................................................................16

*Joblove v. Barr Lab'y (In re Tamoxifen Citrate Antitrust Litig.)*, 466 F.3d 187 (2d Cir. 2006), abrogated by *F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013) .............11

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) .........................................................................17

*McKinnon v. Honeywell Int'l*, 977 A.2d 420 (Me. 2009) ................................................................23

*New York v. Hendrickson Bros.*, 840 F.2d 1065 (2d Cir. 1988) ....................................................14

*Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117 (5th Cir. 1975) ..............................18

*Saccenti v. Target Corp.*, No. 20-cv-4098, 2021 WL 2716644 (E.D.N.Y. July 1, 2021) ..............2

*In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12–md–2343, 2013 WL 2181185
  (E.D. Tenn. May 20, 2013) ...........................................................................................................10

*Thompson v. Metro. Life. Ins. Co.*, 149 F. Supp. 2d 38 (S.D.N.Y. 2001) ........................................3

*U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019) ....................................15

*US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 2725, 2022 WL 874945
  (S.D.N.Y. Mar. 24, 2022) .............................................................................................................16

*Wood v. Carpenter*, 101 U.S. 135 (1879) .....................................................................................13

*Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014) ..................................................16

## OTHER AUTHORITIES

Arizona Antitrust Act.......................................................................................................................22

Sherman Act..............................................................................................................................15, 17

# INTRODUCTION

The undisputed facts show that Defendants publicly disclosed their License Agreement shortly after signing it and, when meeting with purchasers, were open about Novartis's plans to not launch an authorized generic ("AG") concurrently with Par.[1]  Plaintiffs' Opposition, ECF No. 550 ("Opp."), does not contest these facts.  Instead, Plaintiffs attempt to save their claims by minimizing the disclosures and retracting prior admissions about what led them to suspect their claims.  Plaintiffs fail to raise a genuine dispute of material fact sufficient to survive summary judgment.

Plaintiffs first try to avoid the statute of limitations by suggesting that Defendants "fraudulently concealed" the License Agreement.  Despite carrying the burden on each element of fraudulent concealment, Plaintiffs cannot show a genuine dispute of material fact on any of them.  Defendants told at least McKesson, CVS, HEB, and Walgreens—outside the limitations period—that Novartis would not be launching an AG concurrently with Par.  And other purchasers had the information they needed to pursue their claims from the public record.  That those other purchasers chose not to simply ask Par or Novartis about the License Agreement shows neither "concealment" on the part of Defendants nor "diligence" on the part of Plaintiffs.

Plaintiffs also attempt to salvage a portion of their claims under the continuing violation doctrine.  But Plaintiffs misread the case law, which developed in the context of price-fixing allegations not at issue here.  Plaintiffs would have this Court create a new rule that purchasers can *always* recover for antitrust damages in the limitations period regardless of whether there was a continuing course of conduct and regardless of whether Plaintiffs had knowledge of their

---

[1] Capitalized terms herein shall have the same meanings assigned to them in the Memorandum of Law in Support of Defendants' Motion for Summary Judgment on the Statute of Limitations, ECF No. 539 ("Mot.").

claims.  Such a rule would improperly reward Plaintiffs for their inaction and lack of diligence.

Summary judgment should be granted for Defendants on all claims.

## ARGUMENT

**I.    DPPS AND RETAILERS FAIL TO RAISE A DISPUTE OF MATERIAL FACT TO SAVE THEIR CLAIMS FROM THE FOUR-YEAR STATUTE OF LIMITATIONS.**

Plaintiffs do not dispute that the federal statute of limitations is four years, and that the

contract at issue was signed and announced more than six years before they brought their

complaint.  Opp. at 3, 4, 21.  Therefore, DPPs' and Retailers' claims must be dismissed unless an

exception to the statute of limitations applies.  None does.

### A.    Plaintiffs Fail to Raise a Dispute of Material Fact as to Fraudulent Concealment.

Plaintiffs do not dispute many of the key facts that render their claims time-barred and

preclude tolling based on fraudulent concealment.   Plaintiffs do not dispute that the License

Agreement was contemporaneously announced in public filings and disclosed in full to the

Department of Justice and Federal Trade Commission.  RSOF[2] ¶¶ 109-110, 112.  And they do

not meaningfully dispute that by May 2014, Defendants informed at least McKesson, CVS,

HEB, and Walgreens that Novartis would not be launching an AG when Par launched generic

Exforge.  *See* Opp. at 5, 26-27, *infra* Part I.A.1.a.

Faced with this record, Plaintiffs attempt to shift the burden on fraudulent concealment to

Defendants.  Opp. at 14-16.  But Defendants' burden on summary judgment "is satisfied by

pointing to the absence of evidence supporting [Plaintiffs'] case."  Mot. at 3 (quoting *Saccenti v.*

---

[2] Citations to the "RSOF" refer to Plaintiffs' Joint Response to Defendants' Statement of Undisputed Material Facts in Support of Their Motions for Summary Judgment, ECF No. 552.

*Target Corp.*, No. 20-cv-4098, 2021 WL 2716644, at *2 (E.D.N.Y. July 1, 2021)).[3]  Defendants

have done much more than that.  Defendants have adduced evidence that they disclosed, both

publicly and individually, sufficient information to put Plaintiffs on notice.  Plaintiffs fail to

show the disclosures were in any way inaccurate or that Defendants had any duty to share

additional information, precluding a finding that any concealment was "fraudulent."  Plaintiffs

further fail to offer any evidence that Defendants concealed that Novartis was not planning to

launch an AG concurrently with Par—a fact that Plaintiffs previously admitted would have

alerted them to their claims.  Par and Novartis openly shared their expectations regarding an AG

launch with entities that inquired.  That some purchasers chose not to ask for more information

about the publicly announced settlement (thus failing to conduct the necessary diligence) does

not suggest fraudulent concealment.

       1.      **Claims by McKesson, CVS, HEB, and Walgreens should be dismissed.**

There is no genuine dispute of material fact that McKesson, CVS, HEB, and Walgreens

knew of their claims prior to May 16, 2014–the undisputed start of the limitations period—based

---

[3] In *Thompson* and the other such cases cited by Plaintiffs, the party alleging fraudulent concealment adduced *some* evidence demonstrating ignorance of its claim as a direct result of alleged concealment.  Opp. at 14 (citing *Thompson v. Metro. Life. Ins. Co.*, 149 F. Supp. 2d 38, 49-50 (S.D.N.Y. 2001)).  For example, the named plaintiffs in *Thompson* created a factual dispute by "all testif[ying] at deposition that, until recently, they had no actual knowledge of [the defendant]'s alleged practices or that they may have incurred any injury due to the defendant's policies." *Thompson*, 149 F. Supp. 2d at 48-49.  Plaintiffs here have offered no such testimony, nor could they.  *See* Mot. at 16-17.  The portion of *Thompson* that Plaintiffs emphasize addressed only Defendants' burden on the issue of constructive knowledge—*i.e.*, whether "no genuine issue of material fact exists as to whether the plaintiff, exercising reasonable diligence, would have discovered the fraudulent scheme." *Id.* at 49.  And even on that issue, *Thompson* recognized "that summary judgment *is* appropriate when there is no issue of fact." *Id.* at 49-50.  Moreover, the *Thompson* court emphasized that the plaintiffs there, unlike the pharmaceutical wholesale and retail companies here, were "relatively unsophisticated and economically disadvantaged." *Id.* at 49.

on information provided by Par and/or Novartis (via its affiliate Sandoz).  Mot. at 12-16.  Those

entities' claims should be dismissed.

> ### a.    Plaintiffs do not dispute that McKesson, CVS, HEB, and Walgreens were informed that Novartis would not launch an AG.

In addition to their public disclosures (*see infra* Part I.A.2.b.), the undisputed evidence

shows that Defendants informed McKesson, CVS, HEB, and Walgreens, prior to the operative

date of May 16, 2014, that Novartis was not going to launch AG Exforge concurrently with Par.

*See* Mot. at 12-14.  DPPs and Retailers, however, did not file suit until more than four years

later.

Plaintiffs' Opposition does not argue any dispute of material fact on this point.  *See* Opp.

at 5, 26-27.  They relegate to footnotes some disagreements regarding the facts, *see id.* at 5, 22 &

n.8-10, 23, but their only argument that is properly considered relates to the legal effect of

Defendants' disclosures, not a dispute on the material facts themselves.  *See* Opp. at 5 ("*Even if*

*these entities had knowledge that Par believed that it would not face an AG when it launched,*

*they did not know why there would not be an AG.*" (emphasis added)).  Plaintiffs' RSOF does

not do much more.  For each of the disclosures Defendants highlighted in their motion,

Plaintiffs' RSOF focuses more on the legal effect of the disclosure instead of any meaningful

challenge to the facts themselves:

**McKesson:**  Plaintiffs admit that testimony from McKesson's corporate representative

establishes ███████████████████████████████████████████████████████████

████████████████████████████████████████  Plaintiffs further do not dispute

that a McKesson employee met with Par in February 2014 and the McKesson employee

████████████████████████████████████████████████████████████████

4

██████████████████████████████████████████████████████

████  Plaintiffs dispute only "that this purported fact is intended to suggest that Plaintiffs had knowledge of the unlawful No-AG promise prior to March 31, 2015." RSOF ¶ 131.[5]

**HEB:**  Plaintiffs admit that on May 2, 2014, Sandoz emailed HEB a copy of a Sandoz 2014 NACDS presentation. RSOF ¶ 164.  "In that presentation, Sandoz indicated that it would not be launching an authorized generic version of Exforge in 2014." SOF ¶ 164.  On this point, Plaintiffs dispute "that the document reflects that Sandoz would not be launching an authorized generic version of Exforge in 2014." RSOF ¶ 164.  Plaintiffs offer no basis other than a mere conclusion to dispute this fact.  The presentation clearly disclosed that Exforge AG was not in Sandoz's product pipeline for the rest of 2014.  SOF ¶ 164; ECF No. 541-73 at -11-12.

**Walgreens:**  Discovery established that on April 27, 2014, Sandoz gave a presentation to Walgreens at the industry conference NACDS.  SOF ¶ 170, ECF No. 504-23.  Without citation to any record evidence, Plaintiffs dispute that Walgreens received this presentation. RSOF ¶ 170.  But Plaintiffs admit that "Walgreens attends NACDS and NACDS TSE conferences annually," RSOF ¶ 168, and the document itself is titled ██████████ ████  and lists the date and location of the meeting ("NACDS meeting Scottsdale, Arizona April 27, 2014"), ECF No. 504-23.  Plaintiffs have offered zero evidence—by affidavit, or any other record evidence—to dispute that Walgreens attended this meeting with Sandoz, and received this presentation.  As with HEB, Plaintiffs dispute that the presentation supports that

---

[4] Citations to the "SOF" refer to Defendants' Statement of Undisputed Material Facts in Support of Their Motions for Summary Judgment, ECF No. 540.

[5] Notably, while Plaintiffs make much ado about a typo in Defendants' brief, they do not contest the undisputed fact that "[w]hen asked at deposition if 'Par concealed that there would be [] no AG from McKesson,' Ms. Winter testified that, based on her notes of the meeting, Par had 'shared with [her] the information they had.'"  Opp. at 22-23 n.23.

"Sandoz would not launch a generic version of Exforge in 2014."  RSOF ¶ 170.  Plaintiffs offer

no evidence to dispute this fact, and their conclusory denial does not raise any genuine dispute of

material fact.

**CVS:**  Plaintiffs admit that ████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████     RSOF ¶ 156.  Plaintiffs dispute only that ██████ means without an AG,

rather than "refer[ring] to Par's 180-day period of regulatory exclusivity."  Opp. at 5 n.8.  Rather

than offer any affidavit or other competent evidence on ████████████████████████

██████████████     Plaintiffs cite to *In re Glumetza Antitrust Litigation*, No. C 20-01198, 2020

WL 1066934, at *7 (N.D. Cal. Mar. 5, 2020), where the court noted that the term "sole

exclusivity" was on its face "open to reasonable dispute."  But unlike the term "exclusivity" in

*Glumetza*, ████████████ has no regulatory definition that conflicts with its ordinary meaning.

And here, CVS's corporate representative testified at deposition that ████████████████████

████████████████████████████████████████████████████████████

██████████████████     SOF ¶ 157.

Plaintiffs respond that CVS's corporate representative ██████████████████████

██████████████ and therefore ██████████████████████████████████

████████████████████████████████████████████████████████████

██████████████     RSOF ¶ 157 (internal quotations omitted).  But ████████████████

████████████████████████ and CVS's corporate representative—within the

scope of the noticed topic, SOF ¶ 155—testified about ████████████████████████

██████████ which binds CVS.  *See Blackrock Allocation Target Shares: Series S Portfolio v.*

*Wells Fargo Bank, NA*, No. 14-CV-09371, 2017 WL 9400671, at *1 (S.D.N.Y. Apr. 27, 2017).

### b.      Knowledge of Novartis not launching an AG was sufficient to raise suspicion of Plaintiffs' claims.

Plaintiffs next resort to minimizing these disclosures that Novartis would not be launching an AG when Par launched generic Exforge.  *See* Opp. at 26-27.  Plaintiffs argue "[a]t most, these disclosures advised Plaintiffs that there would not be an authorized generic version of Exforge upon Par's launch of generic Exforge," which they suggest was not enough to raise suspicion of their claims that the agreement was anticompetitive.  *Id*. at 27.  They insist that because Defendants did not disclose the alleged no-AG provision in the License Agreement, Plaintiffs could not have known why Novartis did not launch an AG.  Opp. at 4-5.

Plaintiffs misunderstand the law.  In the context of fraudulent concealment, "[a]ny fact that should excite his suspicion is the same as actual knowledge of his entire claim."  *Dayco Corp. v. Goodyear Tire & Rubber Co*., 523 F.2d 389, 394 (6th Cir. 1975); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F.Supp.2d 188, 225 (E.D.N.Y. 2003) (plaintiffs deemed to have notice when they had access to any "fact that should excite . . . suspicion" of their claim (citation omitted)); *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423, 1443 (S.D.N.Y. 1986) ("Facts that should arouse suspicion, for example, are equated with actual knowledge of the claim.").  And Plaintiffs' theory of the case—prior to any "extensive discovery," *see* Opp. at 24—was that they had anticipated that, "[a]bsent the unlawful Agreement, it would make economic sense for Novartis to launch an authorized generic during Par's 180-day marketing exclusivity so that Novartis could retain 50% of the sales that Par's less expensive generic otherwise would otherwise capture."  ECF No. 47, DPP Am. Compl. ¶119. Thus, under their theory, once they learned that Novartis would *not* be launching an AG concurrently with Par,

Plaintiffs had reason to suspect it was due to the License Agreement that Par and Novartis

publicly disclosed years earlier.[6]

Dispositive on this point, several Plaintiffs in this case already conceded that knowledge

that Novartis would not launch an AG concurrently with Par's generic Exforge launch was

sufficient for Plaintiffs to suspect their alleged claims.  In their consolidated Amended

Complaint, DPPs clearly concede:  "Plaintiffs detected no suspicious conduct ***prior to Novartis's***

***failure to launch an authorized generic upon Par's September 30, 2014 entry of generic***

***Exforge***."  ECF No. 47 ¶ 147 (emphasis added).[7]  DPPs' concessions in their individual

Complaints are even clearer:

> It was not until September 30, 2014, at the earliest, ***when Par's launch of***
> ***its generic version of Exforge was not met with a contemporaneous***
> ***launch of an authorized generic by Novartis*** (either directly or through a
> licensee), ***that Plaintiff could have suspected*** that the Agreement precluded
> an authorized generic for some period following Par's launch.

RDC Compl. (No. 18-cv-05708, ECF No. 1) ¶ 131 (emphasis added); FWK Compl. (No. 18-cv-

05886, ECF No. 1) ¶ 131 (same); Drogueria Betances Compl. (No. 18-cv-04361, ECF No. 1) ¶ 132

(same).  Now, faced with the facts uncovered in discovery, Plaintiffs reverse course, arguing that

"the lack of an authorized generic in and of itself is not a particularly 'significant fact.'"  Opp. at

27.  They instead claim that they did not suspect their claims "until Novartis launched AG Exforge

---

[6] *Frontpoint* is not to the contrary.  Opp. at 27.  There, the court held that the availability of
public pricing data did not prevent tolling of the statute of limitations; "fraudulent concealment
would never be available to plaintiffs in the antitrust context because data regarding the affected
price is always available to the public throughout the duration of the conspiracy."  *FrontPoint
Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263, 2017 WL 3600425, at *13
(S.D.N.Y. Aug. 18, 2017).  Defendants do not suggest that public pricing data, alone, would have
put Plaintiffs on notice in this case.

[7] Plaintiffs suggest that "Defendants dishonestly misquote the Direct Purchaser Complaint."
Opp. at 22.  The Court need only read the Plaintiffs' own words, in their complaints, to see that it
is Plaintiffs that are misrepresenting this point.

181 days – to the day – after Par launched its generic version of Exforge." Opp. at 27. The Court should not credit this post-discovery about-face. *See Greenberg v. EPA*, 559 F. App'x 56, 58 (2d Cir. 2014) (crediting complaint allegations as admissions of notice at summary judgment).

Claims by McKesson, CVS, HEB, and Walgreens should therefore be dismissed.

### 2. Defendants did not fraudulently conceal the License Agreement from any other purchaser.

#### a. Plaintiffs fail to prove any affirmative "fraud" or that the agreement was "self-concealing."

Plaintiffs acknowledge that to survive summary judgment on this issue, they must "prove concealment by showing either that the defendants took affirmative steps to prevent Plaintiffs' discovery of the conspiracy, or that the conspiracy itself was inherently self-concealing." Opp. at 17 (quoting *FrontPoint*, 2017 WL 3600425, at *13). Plaintiffs make neither showing.

The only "affirmative acts" Plaintiffs point to are (i) the presence of a standard confidentiality clause in the License Agreement and (ii) that Par and Novartis did not publish their License Agreement to the general public. Neither of these is sufficient to prove the "fraud" necessary for fraudulent concealment. Most fundamentally, "[s]ilence or passive conduct of the defendant is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure." *Donahue*, 633 F. Supp. at 1443 (citation omitted).[8] Plaintiffs point to no such duty.

Plaintiffs suggest that Par and Novartis spoke "half-truths" when they disclosed the existence of the License Agreement, Par's launch date, and to many purchasers, Novartis's plans

---

[8] For this reason, *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-CV-230, 2014 WL 2610613 (D. Vt. June 11, 2014), does not support Plaintiffs' position. There, the court denied summary judgment where the plaintiff "argue[d] the relationship between [defendants] and [parties] is fiduciary in nature and gave rise to an affirmative duty to disclose the true facts and to correct any material factual misstatements." *Id.* at *21.

not to launch an AG, without also disclosing "the existence of the No-AG provision."  Opp. at 20.  Plaintiffs' position goes too far.  Under Plaintiffs' view, once Par and Novartis said anything, they were legally required to say everything.  That is not the law, and such a requirement has never been deemed to support a claim of fraudulent concealment to avoid the statute of limitations.  Companies regularly announce they have reached agreements, without also making public every important term.  Plaintiffs' broad disclosure rule would lead to less, not more, information made available to the public.

Plaintiffs' reliance on *Glumetza* is misplaced.[9]  The summary judgment ruling that Plaintiffs cite had nothing to do with the concealment prong of fraudulent concealment.  The court explicitly stated that "Defendants do not contest their affirmative concealment."  *In re Glumetza Antitrust Litig.*, No. C 20-05251, 2021 WL 1817092, at *15 (N.D. Cal. May 6, 2021).  Instead, it was on the issue of constructive notice that the court denied summary judgment— based on a "hazy" record.  *Id.* at *16.  The motion to dismiss opinion from *Glumetza* provides more context: Plaintiffs in that case had alleged that the defendants failed to disclose a key term to a district court when seeking "the district court's blessing of their settlement agreement," *Glumetza*, 2020 WL 1066934, at *7.  It was in that context that the court held that the allegations were sufficient at the motion to dismiss stage to plead "a duty to disclose."  *Id.*  Here, there are no such allegations (or evidence):  Defendants' disclosures were to the public, not to a court, and

---

[9] *Skelaxin*, upon which Plaintiffs rely, Opp. at 19, also does not support Plaintiffs' sweeping disclosure rule.  The *Skelaxin* court highlighted a number of "affirmative acts" of concealment, including "staying the '102 patent litigation even though there was no longer a justiciable dispute due to the conspiracy[, and] . . . .efforts to file FDA citizen petitions, many of which would have been contrary to [defendant's] interests prior to its decision to enter the conspiracy[.]"  *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12–md–2343, 2013 WL 2181185, at *30 (E.D. Tenn. May 20, 2013).

there is no allegation (nor could there be) that any disclosures were aimed at getting a judicial blessing of their agreement.

Plaintiffs also cannot prove that the License Agreement was "self-concealing."  Opp. at 21-22.  Courts have routinely held that the "self-concealing" exception does not apply to settlements of the type alleged in this case.  Mot. at 8.  Plaintiffs cite no courts accepting their position in this context.  And for good reason: such settlements are required by statute to be filed with the FTC and DOJ, both of which have the ability to file suit to enjoin the settlements if they contend they are unlawful.  Mot. at 8-9.[10]  Furthermore, as Plaintiffs acknowledge, at the time of the License Agreement at issue here, several courts had held that such settlements were entirely immune from antitrust scrutiny.  *See Joblove v. Barr Lab'y (In re Tamoxifen Citrate Antitrust Litig.)*, 466 F.3d 187, 213 (2d Cir. 2006), *abrogated by F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013); Opp. at 7.  And even now, evaluation of such agreements is subject to the rule of reason.  *See* ECF No. 193 (dismissing Plaintiffs' *per se* claims).  The alleged agreement is therefore, as a matter of law, a far cry from a *per se* illegal price-fixing or bid rigging scheme, which, if divulged, "is compromised and collapses." *Ciprofloxacin*, 261 F. Supp. 2d at 224.

> **b.      Plaintiffs do not dispute the numerous public disclosures which were sufficient to raise suspicion of DPPs' and Retailers' claims.**

Plaintiffs do not dispute that Par and Novartis reported in securities filings and investor presentations that they had entered into the License Agreement and that Par would not be

---

[10] Defendants nowhere suggested that one can infer "approval" of agreements from FTC and DOJ inaction.  Opp. at 22 n.22.  But FTC and DOJ can and do commence investigations and file suit where they view a settlement as anticompetitive.  The point is that because all such settlements must be submitted to these authorities so that they can decide whether to take that step, deeming these settlements "self-concealing" would deprive that term of any meaning.

launching generic Exforge until October 2014.  *See* Mot. at 10; SOF ¶¶ 109-12.  These public disclosures put DPPs, Retailers, and all putative class members on notice of their claims.

Plaintiffs argue that these documents "did not put Plaintiffs on notice [of their claim] that Novartis promised not to launch an authorized generic for 180 days after Par's generic launch." Opp. at 23.  But that is not the test.  Plaintiffs must show that they were not on notice of facts "adequate to raise . . . Plaintiffs' **suspicions** as to their claim of injury."  *Ciprofloxacin*, 261 F. Supp. 2d at 224 (emphasis added).  Here, immediately following Par's public disclosure of the agreement, at least one industry analyst suspected that the deal might have limited Novartis's ability to launch an AG.  SOF ¶ 111.  Plaintiffs argue that the analyst did not say that the agreement *definitely* included such a restriction.  *See* Opp. at 24 ("[T]he Travatan Z and Exforge settlements *could* represent significant upside *if* they were structured similarly to the Rhythmol settlement (*e.g.*, *possible* exclusivity parking deals)" (quoting ECF No. 504-8 (Plaintiffs' emphases)).  But, again, certainty is not required.  That an analyst suspected the License Agreement contained such a restriction confirms that Plaintiffs—who include some of the largest and most sophisticated wholesalers and retailers in the United States—could have as well.  And this was even before the FTC issued reports giving Plaintiffs even more reason to suspect their claims.  Mot. at 11-12.

Plaintiffs next protest that "Defendants should not be allowed for purposes of this motion to argue both that the [License Agreement] did not have a No-AG clause and that Plaintiffs should have been on notice that it contained such a clause."  Opp. at 18.  No court has ever held that a defendant has to admit elements of a legal claim in order to prevail on the statute of limitations.  The point for purposes of this motion is not that Plaintiffs' claims are valid, but that whether or not they are valid, Plaintiffs had the information they needed to bring these claims

12

years ago, before the statute of limitations ran.  Moreover, Defendants' positions are not in any

respect inconsistent:  Defendants need not (and do not) concede that section 1.2 of the License

Agreement precluded Novartis from launching an authorized generic (much less, that it did so as

part of an alleged trade for delay in Par's generic launch) in order to make the simple and

indisputable point that several Plaintiffs learned that Novartis would not be launching an

authorized generic immediately upon Par's entry in September 2014, or that other Plaintiffs were

on notice of their claims as described in Defendants' motion.

Because public disclosures put all DPPs, Retailers, and putative class members on notice

of their claims prior to May 2014, their claims should be dismissed.

### c.  All purchasers could have pursued their claims upon reasonable diligence.

Plaintiffs do not dispute that some purchasers "inquired at industry conferences about Par

and Novartis's launch plans for generic or AG products" and that "[t]hese Plaintiffs . . . learned

of Par's generic Exforge entry date or that Novartis would not be launching AG Exforge."  Opp.

at 29.  At a minimum, those Plaintiffs' claims should be dismissed.  *Supra* Part I.A.1.  Further,

because *any* purchaser could have conducted this same basic diligence and learned that Novartis

would not be launching an AG concurrently with Par, Plaintiffs' fraudulent concealment

argument fails.  *See Wood v. Carpenter*, 101 U.S. 135, 141 (1879) ("A party seeking to avoid the

bar of the statute on account of fraud must aver and show that he used due diligence to detect it,

and if he had the means of discovery in his power, he will be held to have known it.").

Plaintiffs first respond that they do not need to show diligence when "it was defendants'

concealment, and not a lack of diligence on their part, that prevented them from knowing their

claim." Opp. at 28.  But Plaintiffs have not shown that the confidentiality provision in the

License Agreement or any other act by Defendants prevented any purchaser from learning about

13

Novartis's plans not to launch an AG.  Just the opposite.  Plaintiffs cannot dispute that Defendants informed multiple purchasers of Novartis's plans.  *See supra* Part I.A.1.a.

Plaintiffs next respond that "[t]here is no evidence or reason to believe that any additional inquiry would have led to the discovery of the [License Agreement's alleged] No-AG clause[.]" Opp. at 29.  But, again, as Plaintiffs admitted, the fact that Novartis would not launch an AG concurrently with Par was discovered by several purchasers outside of the limitations period. *Supra* Part I.A.1.a.  That fact was similarly discoverable by any purchaser that asked.  Thus, any DPPs', Retailers', or putative class members' "continuing ignorance" is "attributable to lack of diligence on [their] part."  *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

### 3.    The Court should not wait until after trial to dismiss untimely claims.

In a last-ditch effort to save their claims from dismissal, Plaintiffs state without citation or substantiation, that "[f]raudulent concealment can best be dealt with during a damages phase of trial or on apportionment."  Opp. at 1.  The Court should reject Plaintiffs' attempt to delay dismissal of their claims.

To begin, Defendants have moved for summary judgment as to the entirety of Plaintiffs' claims based on the statute of limitations.  Plaintiffs suggest that Defendants' arguments regarding fraudulent concealment amounts to a "partial" summary judgment motion because they also plead the continuing violation doctrine.  *Id.*  Not so.  Defendants' motion shows why the statute of limitations bars the entirety of Plaintiffs' claims, without regard to either the fraudulent concealment exception or the continuing violation exception.  As shown below, *infra* Part I.B., the continuing violation exception does not save any portion of Plaintiffs' claims.

Moreover, even if the Court were to rule in Plaintiffs' favor on the continuing violation exception, this would only save Plaintiffs' claims from May 16, 2014 (DPPs and Retailers) and June 19, 2014 (EPPs) forward.  Dismissal of the remaining claims would cut Plaintiffs' alleged

damages by more than half.  *See, e.g.*, ECF No. 494-4, DPP Supplemental Expert Report of

Jeffrey Leitzinger Exs. 15A, 16A, ($187 million before trebling with damages starting on May

16, 2014 vs. $423 million starting on September 21, 2012).  Such a reduction in potential liability

would allow the parties to better assess any remaining claims.  The Court need not wait until a

trial to decide the issues presented in this motion, which can and should be dealt with now to

avoid wasting the Court's and the parties' time later.

> **B.   No Continuing Violation Exception Applies To Resuscitate Claims from May 16, 2014 Forward.**

For the reasons set forth in Defendants' motion and prior briefing, the continuing

violation exception does not apply to save Plaintiffs' claims.  *See* ECF No. 504 at 24-28, Mot. at

19-23.  From its inception, the continuing violation exception has always applied only "if the

defendant engages in 'conduct which constitute[s] a continuing violation of the Sherman Act ***and***

which inflict[s] continuing and accumulating harm.'" *U.S. Airways, Inc. v. Sabre Holdings

Corp.*, 938 F.3d 43, 67 (2d Cir. 2019) (quoting *Hanover Shoe, Inc. v. United Shoe Machinery

Corp.*, 392 U.S. 481, 502 n.15 (1968)) (emphasis added).  So there must be "new and

independent act[s]" by defendants within the limitations period.  *Id.* at 68 (citation omitted).  And

as the Second Circuit acknowledged in *Sabre,* courts hold that "performance of an allegedly

anticompetitive, pre-existing contract" from outside the period "is not a new predicate act." *Id*.

Here, the only allegedly anticompetitive conduct occurred in December 2011 with Defendants'

execution of the License Agreement.

Plaintiffs' citation to *Berkey Photo* continues to be off-base.  *Berkey Photo* involved an

ongoing monopoly resulting from ongoing conduct, not ongoing effects from a pre-limitations

contract.  *Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263, 293 (2d Cir. 1979).  In that

context only, the court held that a continuing violation exception applied when defendant Kodak

raised its prices above the competitive level.   *Berkey Photo* did not, nor could it, displace the longstanding requirement that *some* independent conduct is required within the limitations period.   And such a reading of *Berkey Photo* would be irreconcilable with the Second Circuit's decision in *Sabre*.

DPPs cite to the decision on remand in *Sabre*.   Opp. at 11.   But the holding of that decision supports Defendants' position, not Plaintiffs'.   The district court specifically held that all damages arising out of a contract from outside the limitations period were "time-barred," and allowed the plaintiff to proceed only on allegations concerning "other monopolizing conduct, provided that **both** the conduct and resulting injury ***occurred during the four years***" before suit. *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 2725, 2022 WL 874945, at *5-6 (S.D.N.Y. Mar. 24, 2022) (emphasis added).   Whether *Sabre* applies to other types of plaintiffs was not at issue in the remand decision.   DPPs' citation to *Humana Inc. v. Celgene Corp.*, No. 19-7532, 2022 WL 1237883 (D.N.J. Apr. 27, 2022), is both misplaced and not controlling here. The *Humana* court explicitly acknowledged that the Second Circuit's opinion in *Sabre* "relied, in large part, on the Sixth Circuit's approach that an overt act cannot be a reaffirmation of a previous act," but ruled that "the Third Circuit takes a different approach." *Id*. at *11; *see also Z Techs. Corp. v. Lubrizol Corp.,* 753 F.3d 594, 603 (6th Cir. 2014) ("Sixth Circuit precedent indicates price increases should not be treated as overt acts.   Because this position is consistent with others circuits and leading commentators, we conclude that the price increases in the present case were not overt acts that extended the statute of limitations.").[11]

---

[11] For this reason, the District of Delaware's recent decision in *In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, 2022 WL 2438934 (D. Del. July 5, 2022), *see* ECF No. 555, is not on point.   Like the court in *Humana*, the district court in *Seroquel* was bound to Third Circuit precedent.

Plaintiffs still cannot point to any continuing conduct or new, independent acts within the limitations period that would extend the statute of limitations.  Instead, they assert that purchasers can *always* take advantage of the continuing violation exception when they pay an allegedly inflated price.  Opp. at 7 ("Specifically, under the continuing violation doctrine, a purchaser's overcharge claim accrues and runs from the date of each supracompetitive overcharge, regardless of whether a defendant's unlawful conspiracy may have begun more than four years earlier.").  Not so.  While there are some cases, such as in the context of as price-fixing[12], where setting the price at a high level could be "continuing conduct," this cannot apply to every Sherman Act claim in which purchasers allege overcharges, because that would be *almost every* Sherman Act claim, and the exception would swallow the rule.

That was precisely the distinction made by Judge Liman in *Litovich v. Bank of America*, when he rejected the continuing violation theory in the context of a conspiracy to exclude online trading platforms from the secondary market for certain bonds.  568 F.Supp.3d 398 (S.D.N.Y. Oct. 25, 2021).  Judge Liman distinguished "a price-fixing conspiracy," in which each fixed price "is itself an overt act that is part of the antitrust violation," from higher prices that are not part of the "conspiracy itself but are, at most, the effects of the boycott agreement and actions." *Id.* at 434.  Here, too, DPPs' and Retailers' purchases of branded and generic Exforge at allegedly higher prices are not new independent acts by Defendants which restart the statute of limitations; they are at most, "merely an effect of" the  License Agreement "which therefore does not start the statutory period running again."  *Id.*; *see also DXS, Inc. v. Siemens Med. Sys.*, 100 F.3d 462, 467-68 (6th Cir. 1996) ("[A]cts that are merely 'unabated inertial consequences' . . .

---

[12] *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997), falls into this category because it involved allegations of a price-fixing conspiracy and is therefore inapposite.

do not restart the statute of limitations.") (citations omitted); *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975) ("[A] newly accruing claim for [antitrust] damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action.").

Plaintiffs do not challenge the reasoning of *Litovich*, but instead argue that "[t]he purpose of the boycott in *Litovich* was to punish non-conspirators" while "[t]he purpose of the No-AG clause in the [License Agreement] was to keep the prices of brand and generic Exforge high, *i.e.*, 'higher prices are . . . the conspiracy itself.'" Opp. at 12. Plaintiffs' purported distinction does not work: the allegations in *Litovich* were that defendants were punishing non-conspirators *for offering prices that were too low* (in the form of narrower spreads). 568 F.Supp.3d at 409-10. In other words, higher prices were in every sense the object of the alleged conspiracy in *Litovich*.

In any event, Plaintiffs misunderstand the point Judge Liman made in *Litovich*. In a price-fixing conspiracy, the co-conspirators must work together to set the price of the goods higher than the market will allow; if one independently sells at the market level, the conspiracy fails. Thus, price-fixing is the quintessential "continuing violation": each time the conspirator sells at the price agreed upon by the conspiracy, it is committing a new independent price-fixing act, and "therefore starts the statutory period as to that act." *Id*. at 434. By contrast, the agreement here occurred in 2011, and the parties then went their separate ways. There is no allegation that either coordinated on pricing; to the contrary, Par independently priced its generic Exforge product far below the price that Novartis was selling Exforge. *See* ECF No. 47, DPP Am. Compl. ¶ 121. And just as the group boycott in *Litovich* limited the number of sellers, resulting in higher prices, Plaintiffs allege that the License Agreement resulted in fewer generic sellers on the market, which in turn led to allegedly higher prices. *See Id.* ¶¶ 131-137.

*      *      *

Because neither the fraudulent concealment nor continuing violation exceptions applies, the Court should dismiss DPPs' and Retailers' claims with prejudice.

## II.   EPPS FAIL TO RAISE A DISPUTE OF MATERIAL FACT TO SAVE THEIR CLAIMS FROM STATE STATUTES OF LIMITATIONS.

EPPs admit that their remaining state law claims are subject to statutes of limitations of four years (19 states) and six years (3 states).  Opp. at 29 n.29.  Because Plaintiffs fail to support any exception to those states' statutes of limitation,[13] their claims should be dismissed.

### A.      EPPs Fail To Raise a Dispute of Material Fact Regarding Fraudulent Concealment.

As with DPPs and Retailers, the undisputed evidence shows (i) that there were no affirmative acts of concealment by Par and Novartis (and the License Agreement was not inherently self-concealing) and (ii) that the available information was more than enough to put EPPs acting with reasonable diligence on notice of their claims.  *See supra* Part I.A.2. Therefore, EPPs cannot prove fraudulent concealment.

The record evidence shows that, in addition to public disclosures, in the summer of 2013, Par relayed to Express Scripts—a company that both named EPPs use to monitor the generic market—its belief that Novartis would not be launching an AG of Exforge concurrently with Par. Mot. at 25 (citing testimony from Par's former CEO, Paul Campanelli).  EPPs suggest that Mr. Campanelli's "recollection lacks credibility" because he gave no further details about the

---

[13] Notably, despite representing to the court in their class certification briefing that "variations in state limitations laws" were "minor" and therefore should not trouble the court in granting class certification, ECF No. 551 at 47, Plaintiffs submit a chart consisting of 16 single-spaced pages laying out cases and statutes that they ask the court to consider in determining whether exceptions to these states' statutes apply in this case.  As this demonstrates, and Defendants predicted, "a class action would present significant difficulties to the Court and the jury in discerning the various state statutes of limitations and tolling doctrines."  ECF No. 505 at 54.

interaction.  Opp. at 32, n. 33.[14]  That Plaintiffs did not ask follow-up questions during

Mr. Campanelli's deposition cannot be a basis to conclude that the unrebutted testimony "lacks

credibility."  And EPPs have submitted no evidence of their own, in the form of affidavits from

their representative, Express Scripts, or from any of their own fact witnesses, showing that Mr.

Campanelli's recollection was in any respect incorrect.  The only record evidence is

Mr. Campanelli's unrebutted testimony that Express Scripts was on notice in summer of 2013.

As to EPPs' own knowledge, they assert that they meet their burden to show diligence

because they hired Express Scripts as their PBM, Opp. at 31, but at the same time they assert

they meet their burden on concealment because Express Scripts was not their "agent" and there

is no evidence that Express Scripts ever relayed information concerning the generic Exforge

launch to EPPs, *id.* at 30.  EPPs cannot have it both ways.  Whether or not Express Scripts is

deemed an agent of EPPs for the purposes of notice (it is),[15] it is EPPs who must prove that "it

was defendants' concealment, and not a lack of diligence on their part, that prevented them from

knowing their claim." *FrontPoint*, 2017 WL 3600425, at *13; *see* Mot. App'x A.  Plaintiffs do

not (and cannot) suggest that Par somehow prevented Express Scripts from sharing information

---

[14] Plaintiffs also argue that Mr. Campanelli's testimony should not be credited because he
misspoke about the date of Par's launch (incorrectly testifying, at this one point, that Par
launched in 2013, rather than 2014).  *Id.*  But Plaintiffs misleadingly omit that Mr. Campanelli
submitted a timely errata correcting his testimony on this very point.  *See* Ex. 107 to the
Declaration of Rachel G. Skaistis, filed concurrently, at 1.

[15] Contrary to Plaintiffs' argument, *In re Rezulin Products Liability Litig*ation, 392 F. Supp. 2d
597, 607-08 (S.D.N.Y. 2005), does not address whether PBMs are agents of their clients *as it
relates to information concerning generic launches*.  *Rezulin* was a products liability case that
had nothing to say about the diligence that EPPs (who were not even parties in Rezulin) rely on
PBMs to conduct for purposes of the antitrust claims they bring.  Likewise, the portions of
contracts that Plaintiffs cite, RSOF ¶ 210, say nothing about Express Scripts' independence or
responsibilities in connection with its knowledge of upcoming generic launches.  EPPs should
not be permitted to rely on Express Scripts to show diligence, while entirely disclaiming that
relationship once it became clear that Express Scripts received information barring EPPs' claims.

with EPPs or any of its other clients.  Thus, the only diligence needed to discover EPPs' claims

was simply to ask Express Scripts for the information they "retained" Express Scripts to collect.

Opp. at 30.  This dooms EPPs' fraudulent concealment claims.

Finally, EPPs argue that even if they had learned that Par would be launching "without an

. . . AG[,]" this "does not indicate an agreement between Par and Novartis, let alone an unlawful

one."  Opp. at 32.  But like DPPs, EPPs previously conceded that "[i]t was not until Novartis

failed to launch an AG upon market entry by Par in September of 2014 *that it became clear* that

Novartis and Par's Agreement contained a no-AG promise."  No. 18-cv-05536-AKH, ECF No.

25, EPP Am. Compl. ¶ 189 (emphasis added); *see Greenberg*, 559 F. App'x at 58.  Since EPPs

learned (or should have learned) by summer 2013 that Novartis would not be launching an AG

concurrently with Par, their claims are time-barred.  *See Donahue,* 633 F. Supp. at 1443.

Because EPPs fail to meet their burden to show fraudulent concealment, EPPs' claims

should be dismissed.

### B. EPPs Give No Reason to Depart from this Court's Prior Ruling Rejecting Continuing Violations.

This Court has already ruled—in the context of other of EPPs' state law claims—that

EPPs' continuing violation theory was insufficient to toll the statute of limitations under various

state laws because "the complaint lacks proper allegations of a continuing course of conduct."

ECF No. 193 at 11.  Plaintiffs' Opposition provides no basis to depart from this ruling as to the

remaining EPP claims.

Defendants have shown that for each of the remaining EPP state law claims, the states

either do not recognize a continuing violation theory (Maine, Nevada, and Vermont) or the

continuing violation doctrine applies only where there is continuing conduct during the

limitations period.  Mot. at 26-27, App'x B.  EPPs do not reckon with Defendants' case law in

the particular states at issue, under which they chose to bring their claims.  Instead, their main

rebuttal is their view that antitrust "harmonization" principles counsel in favor of following

federal, not state, law regarding the statute of limitations.  Opp. at 33, App'x B.  They adopt the

same overbroad reading of the continuing violation doctrine under federal law, arguing that

because alleged overcharges were incurred during the class period, "the continuing violation

doctrine protects all claims within [the] four or six year period prior to the first EPP filing."

Opp. at 33.  As discussed above, the federal exception does not support reviving EPPs' untimely

claims.  *Supra* Part I.B.

 In any event, while state law harmonization principles aim to bring *substantive* provisions

of the antitrust laws in line with the similar provisions found in Sections 1 and 2 of the Sherman

Antitrust Act, these provisions do not typically apply to state *procedural* rules such as the statute

of limitations.  *See D.R. Ward Constr. Co. v. Rohm & Haas Co*., 470 F. Supp. 2d 485, 498 (E.D.

Pa. 2006) ("[T]he permissive harmonization clause in the [Arizona Antitrust Act] has been

interpreted as applying to substantive issues, rather than to procedural questions of standing"); *cf.*

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007)

("It would be wrong for a district judge, in *ipse dixit* style, to bypass all state legislatures and all

state appellate courts and to pronounce a blanket and nationwide revision of all state antitrust

laws.").  This issue is in starkest relief with respect to EPPs' citation to harmonization principles

in Maine, Vermont, and Wisconsin.  Despite the four-year statute of limitations under federal

law, Plaintiffs state that six-year statutes of limitations in each of these states should apply.  Opp.

at 29 n.29.  In essence, Plaintiffs advance the plainly incongruous position that state law should

govern the *length* of the statute of limitations, but federal law should govern *exceptions* to the

statute of limitations.  The Court should follow state law, which requires a continuing course of conduct in every state that recognizes the continuing violation doctrine.

In addition, Maine, Nevada, and Vermont do not recognize the continuing violation doctrine in the context of antitrust claims.  Mot. at 27, App'x B.  Plaintiffs do not show otherwise.  For Nevada and Vermont, Plaintiffs simply rehash their harmonization argument, Opp. at 34, but this proves the point.  States which have rejected the continuing violation doctrine in other contexts are not likely to craft an entirely new exception in one specific context based on a substantive "harmonization" principle in their antitrust statutes.  And Plaintiffs' reading of *McKinnon v. Honeywell Int'l*, 977 A.2d 420 (Me. 2009), is mistaken.  There, the court explicitly *declined* to adopt the continuing violation doctrine and held that a purchase within the limitations period explicitly did not reopen the statute of limitations.  *Id.* at 25  ("We decline to adopt the continuing violations doctrine in this case arising from a 1986 occurrence, and in which the statute of limitations period expired in 1992, nine years prior to McKinnon's subsequent purchase of a thermostat in New Hampshire.").

EPPs' claims are time-barred.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted and Plaintiffs' claims should be dismissed with prejudice.  Plaintiffs do not dispute that in light of one-way intervention concerns, the Court should first rule on the pending motions for class certification, ECF Nos. 493 and 495, and, in the event one or both classes are certified, provide sufficient time for notice to putative class members of their rights to opt out, before the Court rules on Defendants' motions for summary judgment.  Mot. at 2-3.

DATED:  July 21, 2022

By: */s/ Benjamin M. Greenblum*

Benjamin M. Greenblum
Andrew Rudge
Elise Baumgarten
Thomas Ryan
R. Chet Otis
Adam Pan
**WILLIAMS & CONNOLLY LLP**
650 Fifth Avenue, Suite 1500
New York, NY 10019
Tel: (646) 949-2800
Fax: (646) 949-2801
bgreenblum@wc.com


*Attorneys for Defendant Par*
*Pharmaceutical, Inc.*

Respectfully submitted,

By: */s/ Rachel G. Skaistis*

Evan R. Chesler
Rachel G. Skaistis
Helam Gebremariam
Jeffrey Ritholtz
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019
Tel: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com

*Attorneys for Defendants Novartis*
*Pharmaceuticals Corporation and Novartis*
*AG*