**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Novartis and Par Antitrust Litigation | **1:18-cv-04361-AKH** |
| This Document Relates to:<br><br>All Direct Purchaser Class Actions | |

**DIRECT PURCHASER CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS FOR THE <u>CLASS REPRESENTATIVES</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...................................................................................................1

II.    SUMMARY OF CLASS COUNSEL'S LITIGATION EFFORTS ...................................7

    A.    Pre-Filing Investigation .................................................................................7

    B.    Prosecution of the Case ..................................................................................8

        1.    The Motion to Dismiss ........................................................................8

        2.    Discovery ...........................................................................................9

            (a)    Fact Discovery ........................................................................9

            (b)    Privilege Disputes ................................................................10

        3.    Class Certification ............................................................................11

        4.    Experts .............................................................................................11

        5.    Summary Judgment and *Daubert* Motions.......................................12

        6.    Trial Preparation ..............................................................................13

        7.    Mediation and Settlement .................................................................14

III.    ARGUMENT .....................................................................................................14

    A.    Class Counsel Should Be Awarded Reasonable Attorneys' Fees .........................14

    B.    The *Goldberger* Factors Support Class Counsel's Fee Request ...........................16

        1.    The Time and Labor Counsel Expended ..................................................16

        2.    The Magnitude and Complexities of the Litigation ..................................17

        3.    The Risk of the Litigation.........................................................................18

        4.    The Quality of Representation...................................................................20

        5.    The Requested Fee in Relation to the Settlement......................................22

        6.    Public Policy Considerations....................................................................24

C.    A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee ........................................................................................................25

D.    Class Counsel's Costs and Expenses Are Reasonable and Were Necessary to the Result ........................................................................................27

E.    Service Awards for the Class Representatives Are Appropriate and Reasonable.......................................................................................................28

IV.    CONCLUSION ........................................................................................................28

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*,
    456 U.S. 556 (1982) ...........................................................................................24

*Ark. Carpenters Health & Welfare Fund v. Bayer AG*,
    604 F.3d 98 (2d Cir.) ...........................................................................................6

*Behrens v. Wometco Enters. Inc.*,
    118 F.R.D. 534 (S.D. Fla. 1988) ...........................................................................21

*Boeing v. Van Gemert*,
    444 U.S. 472 (1980) ...........................................................................................14

*Christine Asia Co. v. Jack Yun Ma*,
    2019 U.S. Dist. LEXIS 179836 (S.D.N.Y. Oct. 16, 2019)..............................3, 18, 26

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ...........................................................................26

*Dial Corp. v. News Corp.*,
    317 F.R.D. 426 (S.D.N.Y. 2016)...........................................................................28

*Fleisher v. Phx. Life Ins. Co.*,
    2015 U.S. Dist. LEXIS 121574 (S.D.N.Y. Sep. 9, 2015) ......................................21

*Fresno County Emps. Ret. Ass'n v. Isaacson*,
    925 F.3d 63 (2d Cir. 2019) ...................................................................... 14, 15-16

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013) ...........................................................................................2, 6

*Garcia v. Pancho Villa's of Huntington Vill., Inc.*,
    2012 U.S. Dist. LEXIS 144446 (E.D.N.Y. Oct. 4, 2012) ......................................17

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000) ...........................................................................15, 16, 21

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ...........................................................................................21

*In re Actos End-Payor Antitrust Litig.*,
    848 F.3d 89 (2d Cir. 2017) ...........................................................................................6

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
  2015 U.S. Dist. LEXIS 138479 (E.D.N.Y. Oct. 9, 2015) ........................................17

*In re Auction Houses Antitrust Litig.,*
  197 F.R.D. 71 (S.D.N.Y. 2000)........................................................................23

*In re Cardizem CD Antitrust Litig.,*
  218 F.R.D. 508 (E.D. Mich. 2003) ...................................................................4

*In re Celebrex (Celecoxib) Antitrust Litig.,*
  2018 U.S. Dist. LEXIS 85125 (E.D. Va. Apr. 18, 2018) ....................................4

*In re Checking Account Overdraft Litig.,*
  830 F. Supp. 2d 1330 (S.D. Fla. 2011)............................................................22

*In re Cipro Cases I & II,*
  348 P.3d 845 (Cal. 2015)................................................................................6

*In re Cipro Cases I & II,*
  2018 Cal. App. Unpub. LEXIS 3258 (Cal. Ct. App. May 14, 2018) ....................6

*In re Credit Default Swaps Antitrust Litig.,*
  2016 U.S. Dist. LEXIS 54587 (S.D.N.Y. Apr. 25, 2016) ...................................24

*In re Effexor XR Antitrust Litig.,*
  2014 U.S. Dist. LEXIS 142206 (D.N.J. Oct. 6, 2014) ......................................6

*In re Flonase Antitrust Litig.,*
  951 F. Supp. 2d 739 (E.D. Pa. 2013).......................................................4, 17, 26

*In re Global Crossing Sec. & ERISA Litig.,*
  225 F.R.D. 436 (S.D.N.Y. 2004)......................................................................22

*In re Hi-Crush Partners L.P. Sec. Litig.,*
  2014 U.S. Dist. LEXIS 177175 (S.D.N.Y. Dec. 19, 2014) ..............................5, 22

*In re Initial Pub. Offering Sec. Litig.,*
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) ......................................................15, 16, 22

*In re Lamictal Direct Purchaser Antitrust Litig.,*
  18 F. Supp. 3d 560 (D.N.J. 2014).....................................................................6

*In re Lidoderm Antitrust Litig.,*
  2018 U.S. Dist. LEXIS 162425 (N.D. Cal. Sep. 20, 2018) ...............................26

*In re Lipitor Antitrust Litig.,*
  46 F. Supp. 3d 523 (D.N.J. 2014).....................................................................6

*In re Lloyd's Am. Tr. Fund Litig.,*
  2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002) ...................................................21

*In re Loestrin 24 Fe Antitrust Litig.*
  45 F. Supp. 3d 180 (D.R.I. 2014) ......................................................................................6

*In re Loestrin 24 Fe Antitrust Litig.,*
  2020 U.S. Dist. LEXIS 125745 (D.R.I. July 17, 2020) .....................................................26

*In re Marsh ERISA Litig.,*
  265 F.R.D. 128 (S.D.N.Y. 2010) ......................................................................................27

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
  2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. Feb. 1, 2007) .....................................................25

*In re Motorsports Merch. Antitrust Litig.,*
  112 F. Supp. 2d 1329 (N.D. Ga. 2000) .............................................................................17

*In re Nexium (Esomeprazole) Antitrust Litig.,*
  842 F.3d 34 (1st Cir. 2016) ................................................................................................7

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
  2019 U.S. Dist. LEXIS 216796 (E.D.N.Y. Dec. 16, 2019) ...............................................14

*In re M.D.C. Holdings Sec. Litig.,*
  1990 U.S. Dist. LEXIS 15488 (S.D. Cal. Aug. 30, 1990) ............................................ 23-24

*In re Prograf Antitrust Litig.,*
  2015 U.S. Dist. LEXIS 199792 (D. Mass. May 20, 2015) ..................................................4

*In re Relafen Antitrust Litig.,*
  2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) ....................................................3

*In re Remeron Direct Purchaser Antitrust Litig.,*
  2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) .........................................................4

*In re Sumitomo Copper Litig.,*
  74 F. Supp. 2d 393 (S.D.N.Y. 1999) .................................................................................26

*In re Syngenta AG MIR 162 Corn Litig.,*
  2018 U.S. Dist. LEXIS 206840 (D. Kan. Dec. 7, 2018) ....................................................23

*In re Telik, Inc. Sec. Litig.,*
  576 F. Supp. 2d 570 (S.D.N.Y. 2008) ........................................................................ 15, 25-26

*In re Terazosin Hydrochloride Antitrust Litig.,*
  2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) ..................................................26

*In re Tricor Direct Purchaser Antitrust Litig.*,
   2009 U.S. Dist. LEXIS 133251 (D. Del. Apr. 23, 2009) .......................................26

*In re Urethane Antitrust Litig.*,
   2016 U.S. Dist. LEXIS 9983 (D. Kan. July 29, 2016) ............................................22

*In re Vitamins Antitrust Litig*,
   2001 U.S. Dist. LEXIS 25067 (D.D.C. July 16, 2001) ...........................................22

*In re Veeco Instruments Sec. Litig.*,
   2007 U.S. Dist. LEXIS 85554 (S.D.N.Y. Nov. 7, 2007).........................................22

*In re Wellbutrin XL Antitrust Litig.*,
   133 F. Supp. 3d 734 (E.D. Pa. 2015).........................................................................6

*In re Wellbutrin XL Antitrust Litig.*,
   868 F.3d 132 (3d Cir. 2017) ......................................................................................6

*La. Wholesale Drug Co. v. Pfizer, Inc. (In re Neurontin Antitrust Litig.)*,
   2014 U.S. Dist. LEXIS 206338 (D.N.J. Aug. 6, 2014) .............................................3

*La. Wholesale Drug Co. v. Sanofi-Aventis*,
   2009 U.S. Dist. LEXIS 77206 (S.D.N.Y. Aug. 28, 2009).........................................7

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) .................................................................................................25

*Moreno v. Deutsche Bank Ams. Holding Corp.*,
   2019 U.S. Dist. LEXIS 36942 (S.D.N.Y. Mar. 7, 2019)...........................................3

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
   2019 U.S. Dist. LEXIS 39807 (S.D.N.Y. Mar. 8, 2019)....................................4, 22

*Velez v. Novartis Pharms. Corp.*,
   2010 U.S. Dist. LEXIS 125945 (S.D.N.Y. Nov. 30, 2010)................................4, 22

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   369 F.3d 96 (2d Cir. 2005) ......................................................................................14

*Woburn Ret. Sys. v. Salix Pharms., Ltd.*,
   2017 U.S. Dist. LEXIS 132515 (S.D.N.Y. Aug. 18, 2017)....................................18

## **Rules**

Fed. R. Civ. P. 23(h)................................................................................................16

**<u>Other</u>**

Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees In Class Actions*,
   89 Fordham Law Review 1151 (2021).........................................................................15

Newberg on Class Actions,
   § 15:87 (5th ed. 2015) ............................................................................................27

## I.      INTRODUCTION

Class Counsel representing Direct Purchaser Class Plaintiffs Drogueria Betances, LLC ("Betances"), Rochester Drug Co-Operative, Inc. ("RDC"), FWK Holdings, LLC ("FWK") and KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc. ("KPH"), and the Direct Purchaser Class[1] respectfully submit this memorandum in support of their Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Service Awards for the Class Representatives.

After nearly five years of hard-fought litigation, Class Counsel has secured a $126,850,000 cash payment from Defendants Novartis Pharmaceuticals Corporation and Novartis AG (collectively, "Novartis")[2] for the benefit of the Class (the "Settlement"), which Novartis already has funded into an escrow account. If approved by the Court, the proposed Settlement would be "an exceedingly good settlement." Jan. 6, 2023 Hearing Tr. 7:4-5. Moreover, efficiency was paramount in Class Counsel's efforts. As the Court observed, "given what's at stake with this case, the number of times that you needed judicial intervention to resolve the dispute was very few. And I think it says something about the professionalism of both plaintiffs' and defendants' lawyers." *Id*. 23:20-25. The Settlement was a result of the skill, creativity, perseverance, and hard work of

---

[1] The "Class" or "Direct Purchaser Class" is defined in the Court's preliminary approval order (ECF No. 595) as:

> All persons or entities in the United States, including its territories, possessions, and the Commonwealth of Puerto Rico, who purchased brand Exforge directly from Novartis, or who purchased a generic version of Exforge directly from Par, at any time during the period from September 21, 2012 until March 30, 2015 ("Exforge Direct Purchasers"). Excluded from the Class are Novartis and Par and their officers, directors, management and employees, predecessors, subsidiaries and affiliates, and all federal governmental entities.

> Also excluded from the Class for purposes of this Settlement Agreement are the following entities:  CVS Pharmacy, Inc. (which includes Omnicare), Rite Aid Corporation, Rite Aid Hdqtrs. Corp., Walgreen Co., The Kroger Co. (which includes Peytons), and H-E-B L.P. ("Retailer Plaintiffs").

[2] Prior to being dismissed with prejudice on January 6, 2023 (ECF No. 594), Par Pharmaceutical, Inc. ("Par") was also a Defendant in this litigation. Novartis and Par may be collectedly referred to as "Defendants" herein.

Class Counsel, who shepherded this case from the outset through briefing class certification, summary judgment and *Daubert* motions, and intensive preparations for imminent trial. The extensive efforts of Class Counsel in achieving this excellent result are described below and in more detail in the Declaration of Bruce E. Gerstein (the "Gerstein Decl.") and individual law firm declarations, filed contemporaneously herewith (Gerstein Decl. Exs. A-J).

On behalf of Betances, Class Counsel filed the first complaint challenging the December 2, 2011 Novartis-Par License Agreement (the "NPLA") in May 2018. Gerstein Decl. ¶ 1. That complaint challenged the NPLA as a "pay for delay" agreement in violation of Sections 1 and 2 of the Sherman Act under the standards set forth in *FTC v. Actavis*, *Inc.*, 570 U.S. 136 (2013). Class Counsel unearthed this case on behalf of the class without the aid of a preceding government action or investigation. Gerstein Decl. ¶¶ 2-3.

Class Counsel pursued this case on a wholly contingent basis without any guarantee of success or compensation. The exceptional outcome was the result of their unique skill and experience gained from a 25-year history (and collectively decades of experience) handling similar cases, and perseverance in the face of vigorous defenses from some of the most distinguished defense firms in the country with commensurate experience and skill.

From case investigation through preliminary approval and notice of the Settlement, Class Counsel expended over 43,000 hours of uncompensated professional time equating to approximately $28 million in lodestar based on 2022 rates, and incurred nearly $2.5 million in unreimbursed out-of-pocket expenses. *Id*. ¶¶ 61, 63-64. As compensation for their efforts, Class Counsel seek an award of attorneys' fees in the amount of 1/3 (or 33 ⅓%) of the settlement fund, net of expenses, reimbursement of incurred expenses, and service awards for the class

representatives, *i.e.*, $41,325,497.58, plus a proportionate amount of accrued interest.[3] In support of this request Class Counsel submit their contemporaneous time records as Exhibits K-T to the Gerstein. Decl. Class Counsel also seek reimbursement of expenses in the amount of $2,473,507.26. *Id*. ¶¶ 61, 63-64. Finally, Class Counsel also seek service awards in the amount of $100,000 each for class representatives Betances, RDC, FWK and KPH. These requests are justified for several reasons.

**First**, the size of the settlement—$126,850,000—is substantial. As the Court observed, the settlement recovery of $126.85 million, or approximately 85% of Plaintiffs' conservative damages estimates, is "an exceedingly good settlement." Jan. 6, 2023 Hearing Tr. 3:17 - 7:5; Gerstein Decl. ¶ 46.[4]

**Second**, the sought fee is consistent with "a baseline reasonable fee by reference to other common fund settlements of a similar size, complexity and subject matter." *Moreno v. Deutsche Bank Ams. Holding Corp.*, 2019 U.S. Dist. LEXIS 36942, at *4 (S.D.N.Y. Mar. 7, 2019). *See also Christine Asia Co. v. Jack Yun Ma*, 2019 U.S. Dist. LEXIS 179836, at *61 (S.D.N.Y. Oct. 16, 2019) (to determine reasonableness, courts compare "fee application to fees awarded in similar . . . class-action settlements of comparable value.") (quotation omitted). Here, Class Counsel's requested fee is in line with numerous prior pay-for-delay antitrust cases:

| Case | Settlement | Fee | Multiplier |
|------|------------|-----|------------|
| *La. Wholesale Drug Co. v. Pfizer, Inc. (In re Neurontin Antitrust Litig.)*, No. 02-1830, 2014 U.S. Dist. LEXIS 206338, at *17 (D.N.J. Aug. 6, 2014) | $191MM | 33 ⅓% | 1.99 |

---

[3] This amount is derived by subtracting the total requested service awards ($400,000) and expenses ($2,473,507.26) from the settlement amount of $126,850,000.00 and multiplying the result by 1/3. [($126,850,000 - $400,000 - $2,473,507.26) * 1/3 = $41,325,497.58].

[4] Other damages estimates depend on Plaintiffs being able to prove, *inter alia*, that the NPLA was fraudulently concealed from Plaintiffs, which was the subject of one of Defendants' summary judgment motions and about which the Court expressed skepticism. Jan. 6, 2023 Hearing Tr. 3:25 - 4:5.

| Case | Settlement | Fee | Multiplier |
|------|:----------:|:---:|-----------:|
| *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) | $175MM | 33 ⅓% | 4.87 |
| *In re Lidoderm Antitrust Litig.*, No. 14-md-02521 (N.D. Cal. Sept. 20, 2018) | $166MM | 27 ½% | 1.05 |
| *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 750-51 (E.D. Pa. 2013) | $150MM | 33 ⅓% | 2.99 |
| *In re Opana ER Antitrust Litigation*, MDL No. 2580, (N.D. Ill. Nov. 3, 2022) ECF Nos. 1081, 1085 | $145MM | 36% | 1.21 |
| *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 533 (E.D. Mich. 2003) | $110MM | 30% | 1.2 |
| *In re Prograf Antitrust Litig.*, No. MDL No. 2242, 2015 U.S. Dist. LEXIS 199792, at *15 (D. Mass. May 20, 2015) | $98MM | 33 ⅓% | 2.35 |
| *In re Celebrex (Celecoxib) Antitrust Litig.*, No. 2:14-cv-00361, 2018 U.S. Dist. LEXIS 85125, at *18 (E.D. Va. Apr. 18, 2018) | $94MM | 33 ⅓% | 1.94 |
| *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) | $75MM | 33 ⅓% | 1.8 |

**Third**, as a general matter, "[d]istrict courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater." *Velez v. Novartis Pharms. Corp.*, 2010 U.S. Dist. LEXIS 125945, at *59 (S.D.N.Y. Nov. 30, 2010) (collecting cases); *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 2019 U.S. Dist. LEXIS 39807, at *22 (S.D.N.Y. Mar. 8, 2019) ("In this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more.") (quoting *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 U.S. Dist. LEXIS 177175, at *31 (S.D.N.Y. Dec. 19, 2014)).

**Fourth**, the fee sought equates to a 1.48 multiplier[5] of Class Counsel's total lodestar, which is reasonable and within the range of multipliers approved by courts in similar cases. *See infra* III.C. This modest multiplier is justified by the unusually high risk, length, and complexities of

---

[5] The multiplier of 1.48 is calculated by dividing the requested fee $41,325,497.58 by the Class Counsel's lodestar of $27,929,118.25.

this case, coupled with Class Counsel's high-quality performance. A simple investment of hours alone would not have sufficed to achieve what this Court described as an "exceedingly good settlement," as Class Counsel were faced with novel substantive, procedural and expert-related issues requiring Class Counsel to make use of all of their decades of experience litigating delayed generic entry cases. Jan. 6, 2023 Hearing Tr. 7:11-15. Indeed, only a small number of law firms have the experience and resources to prosecute and finance direct purchaser Hatch-Waxman antitrust cases like this one. Class Counsel have worked in this area of the law for decades and have developed the field. *See* Gerstein Decl. Exs. A-J. (counsel declarations).

*Fifth*, while most antitrust cases are complex and involve risk, delayed generic entry cases such as this are inherently risky. And this case presented even more challenges and risks than the typical case. Class Counsel faced a thicket of complex facts involving multiple contracts in the context of the intersection of antitrust law, patent law, drug manufacturing, and Hatch-Waxman drug approval regulations. Layered atop these complex questions of fact and law, Class Counsel also had to prove, among other things, (1) what would have occurred in the absence of the challenged reverse payment (*i.e.*, whether and when Par, and other generics, would have won a patent challenge, launched generic Exforge without a license, or entered the market under a lawful license, and whether Novartis would have been willing and able to launch authorized generic Exforge simultaneously with Par's launch); and (2) the damages to the Class from the reverse payment. If not addressed properly, the Class's potential recovery could have been curtailed or eliminated.

Class Counsel were undeterred by these unique complications and risks, resulting in an excellent settlement for the Class.

The risks Class Counsel faced here were real. Previous reverse-payment cases were dismissed after significant outlays of time and expenses by Class Counsel because of intervening judicial decisions, successful summary judgment motions, or adverse jury verdicts. Gerstein Decl. ¶¶ 51-54. For instance, in 2010, over the Honorable Rosemary Pooler's dissent, the Second Circuit, *en banc*, affirmed a district court's grant of summary judgment in a case alleging a $400 million cash reverse payment concerning the drug Cipro, because of the then-emerging "scope-of-the-patent" test. *See Ark. Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98 (2d Cir. 2010), *reh'g denied*, 625 F.3d 779 (2d Cir. 2010). Three years later, after denying certiorari in *Cipro*, the Supreme Court issued *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), enabling a later-filing group of Cipro indirect purchasers to reach settlements in California state court worth hundreds of millions of dollars. *See In re Cipro Cases I & II*, 348 P.3d 845 (Cal. 2015), *on remand*, 2018 Cal. App. Unpub. LEXIS 3258, at *3 (Cal. Ct. App. May 14, 2018) (settlement described). The direct purchaser class in that case made no recovery despite significant expenditures of time and money by Class Counsel.

Even after *Actavis* was decided, dismissals of other cases at the Rule 12 and Rule 56 stages quickly revealed that *Actavis* was not a panacea for the risk these cases present. *See In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734 (E.D. Pa. 2015) (granting the defendants' summary judgment motion in reverse payment case), *aff'd*, *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132 (3d Cir. 2017); *In re Actos End Payor Antitrust Litig.*, 2015 U.S. Dist. LEXIS 127748 (S.D.N.Y. Sep. 22, 2015) (pre-answer dismissal in reverse payment case); *In re Effexor XR Antitrust Litig.*, 2014 U.S. Dist. LEXIS 142206 (D.N.J. Oct. 6, 2014) (same); *In re Lipitor Antitrust Litig.*, 46 F. Supp. 3d 523 (D.N.J. 2014) (same); *In re Loestrin 24 Fe Antitrust Litig.*, 45 F. Supp. 3d 180 (D.R.I. 2014) (same); *In re Lamictal Direct Purchaser Antitrust Litig.*, 18 F. Supp. 3d 560

(D.N.J. 2014) (same). *Wellbutrin XL* was affirmed on appeal while the others were reversed, but the legal landscape was plainly challenging (and unpredictable) after *Actavis*. Even getting to a jury was no guarantee of success for the plaintiffs. *E.g.,* Second Amended Judgment in a Civil Case, *In re Opana ER Antitrust Litig.*, No. 1:14-cv-10150 (N.D. Ill. Aug. 22, 2022), ECF No. 1067 (granting judgment after trial following jury verdict for defendant in a reverse payment case); *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 39 (1st Cir. 2016) (upholding jury verdict for defendant where plaintiff proved an antitrust violation but not causation or damages). *See also La. Wholesale Drug Co. v. Sanofi-Aventis*, 2009 U.S. Dist. LEXIS 77206, at *3 (S.D.N.Y. Aug. 28, 2009) (reflecting jury verdict for defendant in generic delay case).

**Sixth**, this case was settled at a very advanced stage, with nothing left but trial and with intense preparations for same under way. Class Counsel took this case through exhaustive fact and expert discovery, significant motion practice (under Rules 12, 23, 56, 702/*Daubert*, privilege-related proceedings, and the preparation of numerous motions *in limine*), trial preparation (including preparation and exchange of a joint pretrial order and jury instructions), and mediation proceedings. The volume of work and level of commitment from Class Counsel required to reach that late stage in the litigation and ability, against the backdrop of numerous variables that could have diminished or eliminated the chance of any recovery by the Class, to secure such a favorable settlement for the Class further supports Class Counsel's fee request.

In short, these factors strongly support the requested fee—equaling a modest multiplier of 1.48—requested herein.

## II.     SUMMARY OF CLASS COUNSEL'S LITIGATION EFFORTS

### A.     Pre-Filing Investigation

Class Counsel began investigating this case in the spring of 2018. Gerstein Decl. ¶ 1. Class

Counsel analyzed the sequencing of entry of brand, generic and authorized generic ("AG") Exforge and discovered that Novartis's authorized generic Exforge launched on March 31, 2015, just over 180 days after Par's September 30, 2014 generic Exforge launch. Other companies' generic versions of Exforge launched at the same time as Novartis's AG.

Class Counsel determined through independent research and analysis that Par's launch date was the result of a negotiated license agreement between Novartis and Par. ECF No. 1 ¶¶ 106, 131. Class Counsel then analyzed Novartis's licensed patents: the 5,399,578, 6,294,197 and 6,395,728 patents. As to the 5,399,578 patent, Class Counsel determined that it expired on September 21, 2012, and could not have prevented Par's entry after that date. Class Counsel next analyzed Novartis's 6,294,197 and 6,395,728 patents, as well as Par's generic product, and determined that it was unlikely that Par's product infringed those patents. *Id*. ¶¶ 75-90. Based on FDA documents, Class Counsel also determined that there appeared to be no regulatory impediment to Par launching generic Exforge earlier than it did.

Based on these facts, *i.e.*, the existence of an agreement, the timing of Novartis's AG launch about 181 days after Par's generic launch, and the apparent non-infringing nature of Par's generic, Class Counsel concluded that the NPLA was likely a "No-AG" reverse payment agreement that was unlawful under *Actavis* and caused the Class to suffer overcharges.

On May 16, 2018, Class Counsel filed the first case under Section 4 of the Clayton Act, with four claims challenging Novartis's reverse payment to Par under Sections 1 and 2 of the Sherman Act. Gerstein Decl. ¶ 1. Other direct purchasers, retailers and end-payors followed with complaints of their own. *Id*. ¶¶ 1, 5.

### B.   Prosecution of the Case

#### 1.   The Motion to Dismiss

On September 17, 2018, Novartis and Par filed a motion to dismiss. ECF No. 86. Reflecting the strength of Plaintiffs' allegations, Defendants did not seek to dismiss the core allegation that the NPLA constituted an unlawful reverse payment under *Actavis* and therefore did not seek complete dismissal of Plaintiffs' case. Gerstein Decl. ¶ 7. Instead, the motion centered on whether agreeing to a No-AG period of September 30, 2014 through March 1, 2015, during which Par, but not Novartis, competed in the generic market, was *per se* unlawful under the antitrust laws or subject to analysis under the rule of reason. Because the core of Plaintiffs' allegations were not dismissed, Class Counsel turned to discovery next.

### 2.  Discovery

#### (a)  Fact Discovery

Even though, as the Court observed,[6] Class Counsel avoided significant judicial intervention in discovery, Plaintiffs mostly prevailed when intervention was necessary. For example, by Order dated June 6, 2019, the Court granted Plaintiffs' motion to compel Novartis to produce documents reflecting prior instances it launched an AG, because those prior instances were benchmarks against which to weigh the timing of the Exforge AG launch. ECF No. 165. Similarly, on June 18, 2019, the Court granted Plaintiffs' motion to compel the production of Defendants' sales data through December 2017, an important input to Plaintiffs' expert's damages model. ECF No. 167. The Court also granted Plaintiffs' motion to compel non-party Lupin Limited and Lupin Pharmaceuticals, Inc.'s responses to a document subpoena, which were important for causation purposes. ECF No. 253. Gerstein Decl. ¶ 23. Class Counsel also were largely successful

---

[6] Jan. 6, 2023 Hearing Tr. 23:20-25 ("The Court: . . . given what's at stake with this case, the number of times that you needed judicial intervention to resolve the dispute was very few. And I think it says something about the professionalism of both plaintiffs' and defendants' lawyers.").

in enforcing a subpoena in the United States District Court for the Eastern District of Pennsylvania against non-party Alembic for sales data. *Id.* ¶ 22.

Class Counsel analyzed millions of pages of documents and lines of transaction data from Defendants and third parties for use in depositions, expert reports, seeking class certification, opposing summary judgment and in anticipation of trial. *Id.* ¶¶ 12-15. Class Counsel also served two sets of document requests and two sets of interrogatories, twenty subpoenas on third parties, took nineteen fact and five expert depositions, and defended four fact and ten expert depositions (38 depositions overall). *Id.* ¶¶ 12-18. Class Counsel did so efficiently, limiting the participation of counsel for the direct purchaser class to one attendee during the five depositions during which counsel for another plaintiff group was the primary questioner. October 8, 2020 Hearing Tr. 8:9-15.

As discussed below, Class Counsel's diligent pursuit of evidence armed Plaintiffs with documentary evidence and testimony to support their class certification motion, to oppose Defendants' summary judgment and *Daubert* motions, and to prepare for trial.

**(b)** **Privilege Disputes**

Class Counsel materially advanced the case by doggedly pursuing privilege related disputes. Gerstein Decl. ¶¶ 24-25. At the Court's suggestion (Aug. 4, 2021 Hearing Tr. at 63:25-64:2), Plaintiffs submitted a privilege waiver/evidence preclusion motion, arguing that Novartis placed legal advice "at issue" by asserting defenses that impliedly invoked legal advice. ECF No. 359. These issues included Defendants' subjective beliefs concerning patent strength, interpretation of the NPLA, and whether Defendants could have reached an alternative procompetitive license agreement providing for an earlier generic entry date instead of the NPLA. *Id*. This motion, which was fully briefed at the time of settlement, had the potential to substantially

10

narrow Novartis's available defenses. Plaintiffs continued to press the waiver argument in connection with Defendants' *Daubert* and summary judgment arguments. Gerstein Decl. ¶ 25.

### 3.   Class Certification

Class Counsel developed the evidence necessary to support their motion for class certification, which was filed on March 15, 2022. ECF No. 497. While that motion was pending, Plaintiffs and Novartis settled and Plaintiffs again sought certification in the settlement context. During a hearing on January 6, 2023, the Court determined that the requirements for class certification had been met. Jan. 6, 2023 Hearing Tr. 18:11-26:13. The Court certified the Class by Order dated January 6, 2023. ECF No. 595.

### 4.   Experts

At their sole risk and expense (totaling $2 million), Class Counsel retained ten experts who each issued at least one report, and who sat for at least one deposition. Gerstein Decl. ¶¶ 27-28. Plaintiffs also deposed each of Defendants' five experts. *Id.* ¶¶ 29-30. This effort required Class Counsel to master exceptionally complex material. Class Counsel ensured that each expert was fully prepared to provide comprehensible testimony at trial had this action not settled. Plaintiffs' experts provided crucial reports and testimony on the subject matter listed below:

| Expert | Subject Matter |
|---|---|
| Donald S. Allen | Whether Novartis, or a reasonable company in Novartis's position, would have been ready and able to launch Exforge AG earlier and to satisfy demand for both the brand and the AG. |
| Glen P. Belvis | How a reasonable and experienced patent litigator would assess Novartis's chances of success in patent litigation. |
| Stephen R. Byrn | Noninfringement and invalidity of certain Novartis's patents. |
| Einer Elhauge | Whether the NPLA was anticompetitive and whether there existed an economically rational entry date absent the challenged reverse payment. |

| | |
|---|---|
| Jeffrey J. Leitzinger | Class certification, including class wide antitrust impact and damages, and aggregate damages for the Class. |
| Luis A. Molina | Whether Novartis, or a reasonable company in Novartis's position, would have been willing and financially incentivized to launch AG Exforge simultaneously with Par's generic launch. |
| Arthur Schwartzbard | Clinical differentiation of Exforge from other hypertension treatments. |
| Martha A. Starr | Relevant market and market power. |
| Bernice Tao | Whether there were regulatory impediments to Par and other generic companies receiving earlier FDA final approval to sell generic Exforge. |
| Jay R. Thomas | FDA drug approval framework established by the Hatch-Waxman Act and the Patent Act. |

### 5. Summary Judgment and *Daubert* Motions

After expert discovery ended, Defendants filed two summary judgment motions. Gerstein Decl. ¶¶ 33-34. Defendants' first motion argued that the statute of limitations either mandated dismissal of Plaintiffs' claims, or significantly diminished their value. *Id*. ¶ 34. Specifically, they argued that the "continuing violation" doctrine did not apply because the NPLA's 2012 execution was the allegedly unlawful conduct, and Plaintiffs did not sue until 2018. *Id*. While Defendants' motion was pending, the issue of the application of the continuing violation doctrine to purchasers was presented to the Court of Appeals for the Second Circuit in *Litovich v. Bank of America*, case No. 21-2905. The outcome of the appeal in *Litovich*, which is pending a decision, introduced significant risk for Plaintiffs. *Id*. Defendants also argued that even if the continuing violation doctrine applied, Plaintiffs could not satisfy the elements of fraudulent concealment to toll the running of the statute of limitations and thus Plaintiffs' claims were time barred as to damages incurred before May 2014. *Id*. While Class Counsel believe that Plaintiffs had good responsive

arguments, the Court expressed skepticism. *See* Jan. 6, 2023 Hearing Tr. 3:19-4:5 (expressing skepticism about fraudulent concealment).

Defendants' second motion for summary judgment argued that Plaintiffs could not prove causation or damages. Defendants argued that Plaintiffs' theory — that Defendants would have entered into a lawful agreement without a reverse payment and with earlier Par entry — was speculative and unsupported. Gerstein Decl. ¶ 34. Although Class Counsel believe that their causation theories were well-supported, a victory was not certain.

Including their reply, Defendants supported their 99 pages of summary judgment arguments with a 273-paragraph fact statement and 108 exhibits. *Id*. ¶ 34. Defendants also filed six *Daubert* motions, totaling an additional 122 pages of briefing (including replies) and 33 exhibits. *Id.* ¶¶ 33, 35.

Class Counsel opposed Defendants' summary judgment and *Daubert* motions with extensive filings. *Id.* ¶¶ 37-38. Defendants sought to strike some of Plaintiffs' factual responses to their summary judgment motions from the record. *Id.* ¶ 34. Plaintiffs opposed, but there was a risk that certain key responses would be stricken.

Settlement discussions in this case came against the backdrop of these pending summary judgment and *Daubert* motions, and the pending class motion.

### 6.  Trial Preparation

Following summary judgment briefing, Class Counsel began preparing for trial scheduled for January 9, 2023. ECF No. 379. Class Counsel exchanged with Novartis a proposed pretrial order, jury instructions, stipulations of fact and *voir dire* questions. Gerstein Decl. ¶ 40. Class Counsel also prepared drafts of exhibit lists, deposition designations, and multiple motions *in limine* and were generally preparing for trial. *Id*.

### 7.   Mediation and Settlement

The parties reached an agreement in principle on October 6, 2022, following a full-day mediation in Boston before Eric D. Green of Resolutions, LLC, a prominent mediator. *Id*. ¶ 42. As part of that process, Class Counsel provided Mr. Green with voluminous submissions. *Id.* ¶ 43. During the mediation, counsel for each side presented their views of the merits of each other's positions and proceeded to an intense period of arm's-length negotiations. *Id*.

## III.   ARGUMENT

### A.  Class Counsel Should Be Awarded Reasonable Attorneys' Fees

As the Court acknowledged, the $126,850,000 settlement with Novartis on behalf of the Class is an "exceedingly good settlement." Jan. 6, 2023 Hearing Tr. 7:11-15. As explained below, the indisputable value and benefit conferred on the Class by this settlement is a testament to Class Counsel's determined pursuit of victory at every stage of this litigation and warrants the reasonable attorneys' fees sought here of 33 ⅓% of the net settlement amount, constituting a modest multiplier of 1.48.

Under the "equitable fund" doctrine, attorneys for the plaintiffs in a class action may petition the court for compensation from the settlement fund. *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980); Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees . . . that are authorized by law or by the parties' agreement."). "[R]egardless of whether a case is brought pursuant to a statute with a fee-shifting provision, if the parties settle the case by creating a common fund, common-fund principles control class counsel's fee recovery." *Fresno County Emps. Ret. Ass'n v. Isaacson*, 925 F.3d 63, 67 (2d Cir. 2019). The reasonableness of a fee is determined from the "plaintiff's perspective" and "can account for contingency risk where such risk exists." *Id*. at 70.

In common fund cases, to determine a fee, courts may use both the "percentage of the fund" or the "lodestar" methods. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 369 F.3d 96, 121 (2d Cir. 2005). However, "[t]he trend in this Circuit is toward the percentage method." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 U.S. Dist. LEXIS 216796, at *25 (E.D.N.Y. Dec. 16, 2019). This is because "once the parties have agreed to settle, the percentage-of-the-fund methodology serves as an important motivation for counsel to maximize the class's recovery, and, *a fortiori*, counsel's fee." *Fresno County Employees*, 925 F.3d at 71. *See also* Fitzpatrick, Brian T., *A Fiduciary Judge's Guide to Awarding Fees In Class Actions*, 89 Fordham Law Review 1151, at 1170 (2021) (observing that where a court can monitor against premature settlement—which clearly is not an issue here where the parties were preparing for trial—then the percentage of recovery, not lodestar, is the best method for determining appropriate attorneys' fees). The percentage method also dispenses with the burden of a lodestar computation, but courts generally assess the hours submitted by counsel as a "cross-check" on the reasonableness of the requested percentage. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (quotation omitted). *See also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 586 (S.D.N.Y. 2008) ("[T]he administrative problems associated with the lodestar method, and the advantages presented by the percentage of recovery approach, [have] led most district courts in this Circuit to adopt the percentage of recovery methodology.").

Guided by the following factors, this Court has discretion to determine a reasonable fee: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation …; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50; *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 480 (S.D.N.Y. 2009). At bottom, a fee award should be

based on what is reasonable under the circumstances. *Goldberger*, 209 F.3d at 47.

Where, as here, the contingency risk is significant, a reasonable fee should include compensation for such risk. The Second Circuit explained this:

> The plaintiff class is therefore appropriately charged for contingency risk where such risk is appreciable because the class has benefited from class counsel's decision to devote resources to the class's cause at the expense of taking other cases. That is, because class counsel has decided to represent the plaintiff class, class counsel's ability to freely represent other clients is limited by the risk she has assumed that the class's cause will be unsuccessful. The class, having been enriched by counsel's acceptance of its cause at the expense of other clients' causes, may be charged for counsel's assumption of risk on its behalf.

*Fresno County Emps.*, 925 F.3d at 70. In *In re Initial Public Offering Securities Litigation*, the district court awarded a 33 ⅓% fee on a $586 million settlement, concluding that "[i]t is precisely the promise of a reasonable fee that encourages plaintiffs' attorneys to accept cases such as these and risk spending their own financial resources and personal efforts for years until recovery can be obtained for the class." 671 F. Supp. 2d at 502; *id.* at 516 ("[t]his fee takes into account the risks counsel undertook to represent class members and the hard work that was put into resolving this litigation.").

Here, Class Counsel's request for a fee of 33 ⅓% of the settlement fund is supported by the *Goldberger* factors and consistent with the law and awards in similar cases.

### B.   The *Goldberger* Factors Support Class Counsel's Fee Request

#### 1.   The Time and Labor Counsel Expended

Class Counsel expended 43,348.60 hours in prosecuting this case starting from its investigation in early 2018 through the end of January 2023 (excluding time relating to this motion). Gerstein Decl. ¶ 61. As detailed above and in the Gerstein Declaration, Class Counsel: (a) survived a motion to dismiss (*id.* ¶¶ 7-10); (b) reviewed and analyzed millions of pages of documents and lines of transaction data from Defendants and third parties (*id.* ¶¶ 12-17); (c) took

or defended 38 fact and expert depositions (*id.* ¶ 18); (d) consulted with and retained 10 experts in wide-ranging disciplines (*id.* ¶ 27); (e) engaged in substantial discovery motion practice, including on the issue of privilege (*id.* ¶¶ 19-26); (f) fully briefed class certification (*id.* ¶ 32); (g) opposed Defendants' comprehensive summary judgment and *Daubert* motions (*id.* ¶¶ 33-38); (h) substantially prepared for trial that was scheduled for January 2023(*id.* ¶ 40); and (i) prepared for and participated in successful mediation (*id.* ¶¶ 42-43).

This was a large amount of work, performed efficiently, rapidly and creatively in the heart of the pandemic. Moreover, Class Counsel will be expending a significant number of hours in connection with administering the Settlement. *See Garcia v. Pancho Villa's of Huntington Vill., Inc.*, 2012 U.S. Dist. LEXIS 144446, at *22-23 (E.D.N.Y. Oct. 4, 2012) (acknowledging that class counsel would perform more work on behalf of the class after final approval, including "assisting with the administration of the settlement, and answering Class Member questions, which further supports their fee request"). The significant time and labor that has been (and will be) expended by Class Counsel support the reasonableness of the fee request.

### 2.   The Magnitude and Complexities of the Litigation

"An antitrust class action is arguably the most complex action to prosecute." *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000). *See also In re Air Cargo Shipping Servs. Antitrust Litig.*, 2015 U.S. Dist. LEXIS 138479, at *148-49 (E.D.N.Y. Oct. 9, 2015) (price-fixing conspiracy required "complex expert analysis and review of mountains of documents"); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013) ("Antitrust class actions are particularly complex to litigate and therefore quite expensive."). This lawsuit in particular featured unique wrinkles. For instance, this case uniquely required Class Counsel to master various complexities of patent law to show the likelihood that Par would have prevailed on

infringement and validity challenges. Contrary to other generic delay cases, Class Counsel would have to show this without the benefit of an underlying patent litigation record, since Novartis opted never to sue Par for infringement before the NPLA was executed. Gerstein Decl. ¶ 31. As a prerequisite, Class Counsel had to master the biopharmaceutical aspects of hypertension. *Id.* This case also required Class Counsel to master several challenging and interwoven areas of FDA generic drug approval, pharmaceutical manufacturing procedures and timing, as well as Novartis and Par's internal forecasting and manufacturing planning documents. *Id.* Class Counsel used their learning to construct a but-for world absent the challenged conduct with robust earlier generic competition, including from non-party generic manufacturers.

It is hard to overstate the complexities that this massive litigation presented, and the challenge Class Counsel faced in making them comprehensible to a lay jury.

### 3.   The Risk of the Litigation

"[R]isk of the litigation is one of the most important factors, if not the foremost factor, to consider when determining the reasonableness of fee." *Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2017 U.S. Dist. LEXIS 132515, at *17 (S.D.N.Y. Aug. 18, 2017). *See also Christine Asia Co.*, 2019 U.S. Dist. LEXIS 179836, at *62 (similar). When lawyers undertake litigation on a contingency basis, they face the risk of non-payment. *See id.* at *63 ("might never have been recovered."). *See also Woburn Ret. Sys.*, 2017 U.S. Dist. LEXIS 132515 at *17 (lawyers on contingency "assume a great deal of risk").

This litigation presented substantial risks. When Class Counsel filed this case five years ago, no government agency had taken any action to prosecute the challenged conduct. Class Counsel did not have the advantage of "piggy backing" on pre-existing litigation or the reassurance of liability associated with a coinciding government indictment or guilty plea when it initiated the

18

case. Class Counsel then spent years, thousands of hours, and millions of dollars, on a purely contingent basis, facing off against some of the most highly regarded law firms in the country with attorneys who, like Class Counsel, have extensive experience litigating delayed generic entry cases and filed two summary judgment motions which were pending at the time of settlement.

Further, even if unsuccessful at summary judgment, Novartis still could have persuaded the jury that the NPLA did not contain a "No-AG" clause but rather a mere "notice provision" that provided Par sufficient lead time to manufacture generic Exforge. Novartis also could have persuaded the jury that even if the NPLA did contain a reverse payment, it was not "large" or "unjustified" under *Actavis*. Novartis would have also pursued before the jury their aggressive argument that the NPLA did not actually cause any generic delay, nor Plaintiffs' injuries, because Par would not have launched generic Exforge without a license and no alternative license with an earlier entry date was possible. Moreover, assuming Plaintiffs' fraudulent concealment allegations survived summary judgment, Plaintiffs would have to convince the jury that Plaintiffs' evidence met the elements of fraudulent concealment, including lack of actual or constructive knowledge, in the face of Novartis's purportedly contrary evidence.

While Plaintiffs would have to satisfy every element and sub-element of an antitrust cause of action, including violation of the Sherman Act under the rule of reason, causation, and damages, Novartis would have to prevail on just one to defeat or substantially devalue Plaintiffs' claims. The risk from this imbalance is demonstrated by the recent defense verdict in the *Opana ER* litigation in the Northern District of Illinois, where the jury found an antitrust violation, but returned a verdict for the brand defendant Endo due to perceived procompetitive justifications. *In re Opana ER Antitrust Litig.*, 1:14-cv-10150 (N.D. Ill. Aug. 22, 2022), ECF No. 1067.

These risks would present themselves yet again during the inevitable appeal to the Second Circuit, and conceivably the Supreme Court. Viewed against these risks, the $126.85 million Settlement that, as the Court observed, is "exceedingly good" and equal to approximately 85% of Plaintiffs' conservative damages estimate, as described above. *See also* Gerstein Decl. ¶ 46. These risks "of establishing liability and proving damages [], further support the granting of the application for fees." *Christine Asia Co.*, 2019 U.S. Dist. LEXIS 179836, at *64.

### 4. The Quality of Representation

Class Counsel have decades of experience pursuing and trying delayed generic antitrust cases. *See* Gerstein Decl. ¶ 49. No group of firms has litigated more such cases. And each firm, or its members, specialize and focus on certain aspects of the case (*e.g.*, antitrust liability, market power, pharmaceutical patents, regulatory approval and manufacturing processes, damages, etc.), while working collaboratively on overall case strategy to ensure the team efficiently litigates the case and utilizes its vast sophisticated litigation experience to benefit the Class and evaluate the appropriateness of settlement. The results speak for themselves: Class Counsel have recovered billions of dollars on behalf of substantially similar classes.

Here, Class Counsel vigorously litigated this unusually complicated case from initial investigation in early-2018 into trial preparation and settlement with both skill and faithful adherence to the Class's best interests at every stage. As the Court recognized, among Class Counsel are "the leading attorneys in this field representing plaintiffs, and you showed your competence in the way you handled this case." Jan. 6, 2023 Hearing Tr. 23:16-19. *See also id.* 19:7-14 (this was "a five-year litigation. It was hard fought. There were a lot of procedural issues that had to be surmounted. There were motions that had to be surmounted. There were discovery

issues that had to be taken care of. And you saw it through all these in a very fine fashion and brought this case to the point where it was ready for trial.").

Class Counsel's skill and experience was demonstrated by the leading role they took overall. Specifically, while this case was coordinated between multiple plaintiff groups, Class Counsel handled most of the discovery, deposed most of the witnesses in this case, presented the coordinated plaintiffs' joint positions at hearings, drafted most of the briefing, and led trial preparations.

Perhaps most importantly, the extraordinary results achieved by Class Counsel in this case fully support the requested award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("critical factor is the degree of success obtained"); *Goldberger*, 209 F.3d at 55 ("the quality of representation is best measured by results"); *In re Lloyd's Am. Tr. Fund Litig.*, 2002 U.S. Dist. LEXIS 22663, at *82 (S.D.N.Y. Nov. 26, 2002) ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained.") (quoting *Behrens v. Wometco Enters. Inc.*, 118 F.R.D. 534, 547-48 (S.D. Fla. 1988)). Here, as the Court recognized, "85 percent of damage is an exceedingly good settlement. No matter how strong your case, the vagaries of a trial and an appeal and the time factor and the expense factor make an 85 percent settlement exceedingly good." Jan. 6, 2023 Hearing Tr. 7:11-15. This percentage of monetary relief is far greater than in other class actions of comparable complexity. For example, in *Fleisher v. Phx. Life Ins. Co.*, the Court held that a settlement with a cash award amount equal to 68.5% of COI overcharges was "one of the most remunerative settlements this court has ever been asked to approve." 2015 U.S. Dist. LEXIS 121574, at *37 (S.D.N.Y. Sept. 9, 2015).

And Class Counsel achieved this result in an efficient manner, without overburdening the Court, which recognized that "given what's at stake with this case, the number of times that [Class

Counsel] needed judicial intervention to resolve the dispute was very few. And I think it says something about the professionalism of both plaintiffs' and defendants' lawyers." Jan. 6, 2023 Hearing Tr. 23:20-24; *id*. 24:3-5 ("I noticed the high degree of professionalism in this case and both sides should be commended for that.").

Finally, "the quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004). Novartis was represented by Cravath Swaine & Moore LLP. As the Court recognized, "taking on a litigation like this against one of the most powerful drug companies represented by one of the most outstanding law firms in the country is not an easy task." Jan. 6, 2023 Hearing Tr. 18:21-24. "That Plaintiffs' Counsel was able to obtain a substantial settlement from these Defendants confirms the quality of Plaintiffs' Counsel's representation in this matter, and is a factor in determining the reasonableness of the fee request." *In re Veeco Instruments Sec. Litig.*, 2007 U.S. Dist. LEXIS 85554, at *23 (S.D.N.Y. Nov. 7, 2007).

### 5.   The Requested Fee in Relation to the Settlement

As discussed in the Introduction, a 33 ⅓% fee is both well within the range of fee awards within this Circuit and for delayed generic entry antitrust cases like this one. *Velez*, 2010 U.S. Dist. LEXIS 125945, at *59 (collecting cases); *N.J. Carpenters Health Fund*, 2019 U.S. Dist. LEXIS 39807, at *22 (S.D.N.Y. Mar. 8, 2019) (quoting *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 U.S. Dist. LEXIS 177175, at *31 (S.D.N.Y. Dec. 19, 2014)); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 480 (awarding 33 ⅓% of $510 million settlement). *See also In re Urethane Antitrust Litig.*, 2016 U.S. Dist. LEXIS 99839, at *77 & n.5 (D. Kan. July 29, 2016) (33 ⅓% fee on $835 million settlement fund); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330

(S.D. Fla. 2011) (30% of $410 million settlement); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist.

LEXIS 25067, at *55 (D.D.C. July 16, 2001) (33.7% of $365 million settlement).

Thus, in *In re Buspirone Patent Litigation*, No. 01-MD-1410 (S.D.N.Y. Apr. 17, 2003)

(Ex. A), another delayed generic entry antitrust case on behalf of a class of direct purchasers, Judge

Koeltl, applying the *Goldberger* factors, approved a requested fee of 33 ⅓% of a settlement fund

of $220 million, reasoning that:

> The fee of one third falls within the range of rates that have been approved in other
> class actions. Determining then whether the percentage fee is a reasonable in this
> case applying the traditional standards it's clear . . . that this is a very large and
> complex litigation. There is always risk involved in the litigation. The fee that's
> being sought is a completely contingent fee. The case was taken . . . on a contingent
> basis and that is entitled to greater weight than simply an hourly rate because the
> lawyers could have walked away having done substantial work with no recovery.

*Id*. at 41-43. Judge Koeltl's reasoning is equally applicable in this case and supports the requested

fee of 33 ⅓% of the net Settlement amount. Class Counsel's effective hourly rate for attorneys for

this case was approximately $690. This is well within the range of reasonableness (the multiplier

is discussed in Part III.C., *infra*.). For instance, a 2014 National Law Journal survey, which

contained information for 159 of the largest law firms in the U.S., found a median rate for the

highest partner billing rate category of $775 and a median hourly rate for the highest billing

associates of $510. *See* Ex. B, hereto. Rates have increased dramatically in the decade since. *See*

Ex. C, hereto.

Reductions to the percentage award should not be considered because to do so would

disincentivize class action lawyers from holding out for incremental benefits on behalf of the class.

*See In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 80 (S.D.N.Y. 2000) ("[A]djusting

downward the percentage of the recovery awarded to counsel as plaintiffs' recovery increases . . .

may give rise to an attorney incentive problem by creating declining marginal returns to effort for

counsel . . . Again, this method can create an incentive to settle quickly and cheaply, when the returns to effort are highest, rather than investing additional time and maximizing plaintiffs' recovery."). *See also In re Syngenta AG MIR 162 Corn Litig.*, 2018 U.S. Dist. LEXIS 206840, at *101 (D. Kan. Dec. 7, 2018) (articulating same "incentive problem" observations and therefore awarding 33 ⅓% fee on a $1.5 billion settlement). As Judge Sofaer explained:

> It unquestionably is true that without able lawyers handling these matters not only do some of them go unprosecuted, but the big difference in my experience is in the amount obtained and you don't get the highest recovery and when you are paying at the low end of the scale of fee recovery in contingent actions, it seems to me that I as the protector of the class, can fairly say, and honestly say, that I believe it is in the class' best interests – of this class and of future classes yet unknown – to pay this kind of money for these kinds of benefits.

*In re Pepsico Secs. Litig.*, Civ. A. No. 82-Civ-8403 (S.D.N.Y. Apr. 26, 1985), Tr. of April 26, 1985 hearing at 17-18 (as quoted in *In re M.D.C. Holdings Sec. Litig.*, 1990 U.S. Dist. LEXIS 15488, at *30-31 (S.D. Cal. Aug. 30, 1990) (awarding 30%)).

### 6.  Public Policy Considerations

"Private suits are an important element of the Nation's antitrust enforcement effort." *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 572 n.10 (1982). In service of that rationale, courts recognize that "it is important to encourage top-tier litigators to pursue challenging antitrust cases…[because] [o]ur antitrust laws address issues that go to the heart of our economy." *In re Credit Default Swaps Antitrust Litig.*, 2016 U.S. Dist. LEXIS 54587, at *55 (S.D.N.Y. Apr. 25, 2016). This case presents an excellent example of these principles. No government agency pursued the antitrust implications of Novartis's reverse payment even though the settlement was reported to the Federal Trade Commission and the Department of Justice. ECF No. 552 ¶¶ 66-68. Perhaps no government agency even detected the reverse payment or the delay

in generic competition it caused. But Class Counsel did, pursuing this case despite its many challenges, and recovering nearly all of the Class's overcharges.

Moreover, in recent years, the pharmaceutical industry has drawn a significant amount of attention (and criticism) due to the increasing prices of prescription drugs. This litigation, and the amount of money that Novartis will pay to the Class, send a clear message that purchasers of pharmaceutical products will not tolerate anticompetitive behavior that raises the prices of pharmaceutical products. It is hoped that the payment of $126.85 million will deter pharmaceutical companies from engaging in similar types of unlawful conduct in the future. The end result of this hoped-for deterrence is increased competition.

### C.    A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee

Class Counsel's fee request is reasonable under the lodestar method as well. As detailed in the Gerstein Decl., Class Counsel worked 43,348.60 hours on this case thus far, amounting to $27,929,118.25 in lodestar based on 2022 rates. Gerstein Decl. ¶ 61. Class Counsel expended these hours at reasonable rates. In determining whether the rates are reasonable, the Court should consider the attorneys' professional reputation, experience, and status. Here, Class Counsel are amongst the most accomplished antitrust practitioners in the pharmaceutical antitrust field, as the Court recognized. *See supra* § III.B.4. Moreover the average rate for attorneys (excluding staff and paralegals) of approximately $690 per hour is objectively reasonable compared to prevailing rates. Specifically, "[p]artners in New York, for example, billed about $958 per hour in 2019; $1,000 in 2020 and $1,034 [in 2021] . . . Associates in the Big Apple billed an average of $633 per hour in 2019; $678 in 2020 and $712 [in 2021]." Ex. C, *Associate Billing Rates Are Growing Faster Than Partner Rates*, ALM, February 3, 2022. Therefore, the hourly rates are reasonable

here.[7] *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 2007 U.S. Dist. LEXIS 9450, at *73 (S.D.N.Y. Jan. 31, 2007) (approving counsel's hourly rates).

A 33 ⅓% fee award equals a lodestar multiplier (net of expenses and service awards) of 1.48. "[C]ounsel may be entitled to a 'multiplier' of their lodestar rate to compensate them for the risk they assumed, the quality of their work and the result achieved for the class." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d at 590. *See also Christine Asia Co.*, 2019 U.S. Dist. LEXIS 179836, at *62 ("No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.") (*quoting City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974)). Although lodestar multipliers naturally tend to increase in direct proportion to the size of a recovery, "when the fee is less than double the lodestar, even in a megafund settlement, a one-third-of-fund fee may be endorsed as reasonable." *In re Loestrin 24 Fe Antitrust Litig.*, 2020 U.S. Dist. LEXIS 125745, at *43 (D.R.I. July 17, 2020).

Here, a lodestar "cross-check" shows that the fee requested in this case is commensurate with the fee awarded in comparable class action settlements. Such a multiplier falls within the range routinely awarded by courts in this Circuit and elsewhere. This is certainly true in Hatch-Waxman antitrust cases brought under Section 4 of the Clayton Act. Judge Koeltl awarded class counsel a 33 ⅓% fee in the *Buspirone* case which translated into an 8.46 multiplier. Ex. A, at 42:12-45:18. *See also Loestrin 24 Fe*, 2020 U.S. Dist. LEXIS 125745, at *45-47 (awarding 33 ⅓% equating to a 1.31 multiplier); *In re Lidoderm Antitrust Litig.*, 2018 U.S. Dist. LEXIS 162425, at *31-34 (N.D. Cal. Sep. 20, 2018) (awarding 33 ⅓% equating to a 1.37 multiplier); *In re Flonase*

---

[7] The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989).

*Antitrust Litig.*, 951 F. Supp. 2d 739, 751 (E.D. Pa. 2013) (awarding 33 ⅓% equating to a 2.99 multiplier); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-340 (SLR), 2009 U.S. Dist. LEXIS 133251, at *16 (D. Del. Apr. 23, 2009) (awarding 33 ⅓% equating to a 3.93 multiplier); *In re Terazosin Hydrochloride Antitrust Litig.*, 2005 U.S. Dist. LEXIS 43082, at *21 (S.D. Fla. Apr. 19, 2005) (awarding 33 ⅓% equating to a 1.27 multiplier); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 400 (S.D.N.Y. 1999) (awarding 27.5% equating to a 2.5 multiplier). Given the risk Class Counsel assumed and the amount of time, labor, and expense dedicated to litigating this case through to preparation for trial, the requested fee is reasonable. *See* Newberg on Class Actions §15:87 (5th ed. 2015) (substantial multiplier is appropriate where case was risky, time-consuming, involved wrongdoing uncovered by counsel in the first instance, and delivered exceptional results).

The lodestar cross-check in this case supports the requested fee.

### D.  Class Counsel's Costs and Expenses Are Reasonable and Were Necessary to the Result

It is well-settled that counsel who have created a common fund for the benefit of a class are entitled to be reimbursed for out-of-pocket expenses reasonably incurred in creating the fund. *See In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010). Here, Class Counsel's unreimbursed expenses were reasonably incurred and necessary to the representation of the Class. These expenses have been itemized by category for the Court's convenience. *See* Gerstein Decl. ¶¶ 63-64. These expenses include costs for computerized legal research, the creation and maintenance of an electronic document database, experts, travel and lodging expenses, copying, court reporters, deposition transcripts, and mediation. *Id.* These are the typical kinds of expenses that are routinely deemed reasonable and necessary. *Marsh*, 265 F.R.D. at 150 (such expenses are "ordinary and necessary"). Accordingly, Class Counsel respectfully request that the Court approve reimbursement of Class Counsel's expenses in full.

### E.   Service Awards for the Class Representatives Are Appropriate and Reasonable

The purpose of service awards is to reimburse named plaintiffs, who "take on a variety of risks and tasks when they commence representative actions[.]" *Id.* Here, Class Counsel believes that awards of $100,000 each to class representatives Betances, RDC, FWK and KPH are appropriate, in recognition of the hours they spent participating in this litigation, filing suit, collecting discovery, sitting for depositions, and defending their adequacy in motions. *See* Gerstein Decl. ¶¶ 67-71. Moreover, courts have recognized the risks inherent in filing suit as a named plaintiff on behalf of a class against an entity with which all class members transact business. *See Dial Corp. v. News Corp.*, 317 F.R.D. 426, 439 (S.D.N.Y. 2016) ("[T]he decision to fire the first shot on behalf of the Class was fraught with risks. Notably, the named Plaintiffs in this case assumed a substantial risk in antagonizing a longstanding, powerful business partner[.]").

The amount requested here is in line with awards made to named representatives in other Hatch-Waxman antitrust cases. *E.g., In re Opana ER Antitrust Litig.*, MDL No. 2580, ECF No. 1085 at ¶ 16 (N.D. Ill. Nov. 3, 2022) ($150,000); *In re Lidoderm Antitrust Litig.*, No. 3:14-md-02521-WHO, ECF No. 1054 at ¶ 15 (N.D. Cal. Sept. 20, 2018) ($100,000); *In re K-Dur Antitrust Litig.,* Civ. A. No. 01-1652, ECF No. 1057 at ¶ 12 (D.N.J. Oct. 5, 2017) ($100,000); *In re Modafinil Antitrust Litig.*, Civ. A. No. 2:06-cv-01797 (MSG), ECF No. 870 at ¶ 30 (E.D. Pa. Oct. 15, 2015) ($100,000 to certain representatives); *In re Neurontin Antitrust Litig.,* Civ. A. No. 02-1830 (FSH), ECF No. 114 at ¶ 31 (D.N.J. Aug. 6, 2014) ($100,000).

## IV.   CONCLUSION

For the reasons set forth above and in the Gerstein Declaration, Class Counsel respectfully request that this Court enter an Order awarding Class Counsel fees in the amount of $41,325,497.58 million, *i.e.,* 33 ⅓% of the Settlement (net of expenses and service awards) plus a

*pro rata* share of the accrued interest, and reimbursement of incurred expenses in the amount of $2,473,507.26. Class Counsel also respectfully request that this Court approve service awards of $100,000 to each of the four class representatives for their efforts on behalf of the Class.

Dated: February 23, 2023

Respectfully submitted,

*/s/ Bruce E. Gerstein*

Bruce E. Gerstein
Dan Litvin
Deborah A. Elman
**GARWIN GERSTEIN & FISHER LLP**
88 Pine Street Fl. 10
New York, NY 10005
212-398-0055
Email: bgerstein@garwingerstein.com
dlitvin@garwingerstein.com
delman@garwingerstein.com

*Attorneys for Plaintiff Drogueria Betances, LLC Lead Counsel for the Direct Purchaser Class*

**FARUQI & FARUQI, LLP**
Kristyn Fields
685 Third Ave., Floor 26
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: kfields@faruqilaw.com

**FARUQI & FARUQI, LLP**
Peter Kohn
Joseph T. Lukens
1617 JFK Blvd., Suite 1550
Philadelphia, PA 19103
Tel: (215) 277-5770
Email: pkohn@faruqilaw.com
Email: jlukens@faruqilaw.com

**BERGER MONTAGUE PC**
David F. Sorensen
Caitlin G. Coslett
Andrew C. Curley
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: dsorensen@bm.net
Email: ccoslett@bm.net
Email: acurley@bm.net

*Attorneys for Plaintiff Rochester Drug Co-Operative, Inc. and the Direct Purchaser Class*

**KAPLAN FOX & KILSHEIMER, LLP**
Robert N. Kaplan
Matthew P. McCahill
Ralph E. Labaton
850 Third Avenue, 14th Floor
New York, New York 10022
Tel: 212-687-1980
Fax: 212-687-7714
Email: rkaplan@kaplanfox.com
Email: mmccahill@kaplanfox.com
Email: rlabaton@kaplanfox.com

**SPERLING & SLATER, P.C.**
Joseph M. Vanek

**SMITH   SEGURA   RAPHAEL   &   LEGER, LLP**
David Raphael
Erin Leger
Susan Segura
221 Ansley Boulevard
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741
Email: draphael@ssrllp.com
Email: eleger@ssrllp.com
Email: ssegura@ssrllp.com

**ODOM & DES ROCHES, LLC**
Stuart Des Roches
Andrew Kelly
Dan Chiorean
Poydras Center
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078
Email: stuart@odrlaw.com
Email: akelly@odrlaw.com
Email: dchiorean@odrlaw.com

**HEIM PAYNE & CHORUSH LLP**
Russell A. Chorush
1111 Bagby, Suite 2100
Houston, TX 77002
Tel: (713) 221-2000
Fax: (713) 221-2021
Email: rchorush@hpcllp.com

*Attorneys for Plaintiff Drogueria Betances, LLC and the Direct Purchaser Class*

**ROBERTS LAW FIRM, P.A.**
Michael L. Roberts
Stephanie E. Smith
20 Rahling Circle
Little Rock, AR 72223
Tel.: (501) 821-5575
Fax: (501) 821-4474
mikeroberts@robertslawfirm.us
stephaniesmith@robertslawfirm.us

David P. Germaine
55 W. Monroe, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
Email: jvanek@sperling-law.com
Email: dgermaine@sperling-law.com

*Attorneys for Plaintiff KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc and the Direct Purchaser Class*

*Attorneys for Plaintiff FWK Holdings, LLC and the Direct Purchaser Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing memorandum was served on all parties of record through the Court's Electronic Case Filing and Case Management system on February 23, 2023.

<u>*/s/ Bruce E. Gerstein*</u>

Bruce E. Gerstein